[No. B061786. Second Dist., Div. Seven. Oct. 27, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
ELMOR JACOB De LEON, Defendant and Appellant.

## COUNSEL

Gary M. Bock, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Acting Assistant Attorney General, William T. Harter and Donald T. Oeser, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WOODS (Fred), J.**—A jury convicted appellant of second degree murder (count I, Pen. Code,[1] § 187, subd. (a)), attempted second degree murder (count II, §§ 664/187, subd. (a)), assault with a firearm (count III, § 245, subd. (a)(2)) and found gun use allegations (§ 12022.5), as to each count, true.

Appellant contends the trial court committed error, prejudicial as to counts I and II, by failing to sua sponte instruct on imperfect self-defense. (*People v. Flannel* (1979) 25 Cal.3d 668 [160 Cal.Rptr. 84, 603 P.2d 1].) We disagree and affirm the judgment.

### FACTUAL BACKGROUND

Although there is no insufficiency of evidence claim, it is necessary to fully describe the evidence because appellant contends there was substantial evidence of imperfect self-defense.

On Thursday, October 18, 1990, when Richard Monterrosa finished work at his construction job he went to the bank with four fellow workers. It was payday and they wanted to make deposits. They drove in two cars, arrived before 4 p.m., and then briefly went home before going to the Pizza Hut for pizza and beer.

---

[1]Unless otherwise noted, all statutory references are to the Penal Code.

Around 6:30 p.m., when they left the restaurant, one of the men, Alfredo Fuentes, said he wanted to stop and buy some doughnuts for his children. He knew of a doughnut shop in a minimall at Normandie and 6th Streets and the five men, in two cars, drove toward it.

A short distance from that doughnut shop, Julio Sandoval was saying goodbye to his girlfriend Jackie M. They were in front of her apartment building at 541 South Normandie. Julio Sandoval kissed her and was about to leave when Jackie M.'s father, Rudolfo Marroquin, called to her from a white pickup truck parked across the street. Jackie M. left Julio Sandoval, Rudolfo Marroquin exited the truck, and the two of them talked. Jackie M. could tell her father had been drinking. He was angry that Julio Sandoval was there. Rudolfo Marroquin then walked to Julio Sandoval and yelled at him. Appellant, who had been sitting in the pickup truck with Rudolfo Marroquin, exited the truck and approached Jackie M., his cousin. Jackie M. asked appellant to calm her father.

Appellant approached Julio Sandoval who noticed appellant had been drinking. Appellant said, "You don't know me" and Julio Sandoval replied, "So?" Appellant said, "I could kill you" and Julio Sandoval responded, "So go ahead." Appellant then stated "I'm deadly" and punched Julio Sandoval in the face. Julio Sandoval kicked appellant "between his legs." Appellant reached into his right pocket, and removed a small .22-caliber revolver and fired a shot at the ground.

Julio Sandoval ran, hid behind a nearby parked car, looked underneath it to see where appellant was, and when he saw him coming around the car ran south on Normandie toward the 6th Street minimall.

Jackie M. saw appellant run after Julio Sandoval. "[H]e stopped and had the gun. He had the gun on him." With "his arm extended" and "the gun out" pointed in Julio Sandoval's direction, appellant fired a second shot.

Julio Sandoval, uninjured, ran through the minimall parking lot and disappeared from Jackie M.'s view.

Richard Monterrosa and his four fellow workers had just parked their cars on Normandie and were walking to the doughnut shop when they heard gunshots. Mr. Monterrosa saw one man with a gun chasing another man who had no gun. The two men ran toward the minimall and disappeared from Mr. Monterrosa's view.

Mr. Monterrosa and his companions crossed Normandie and continued toward the doughnut shop. Because of the Normandie traffic the five men

did not all cross the street together. Alfredo Fuentes was the first to cross. When Mr. Monterrosa, who was behind Mr. Fuentes, crossed he saw Mr. Fuentes "struggling" with the man he had just seen running with the gun, appellant.

Mr. Fuentes asked his friends to help him and said "Let's take the gun away from him because he can kill us." Mr. Monterrosa and Carlos Escobar helped Mr. Fuentes hold appellant and look for the gun. The other two men, Andres Gonzales and Leonardo Gil, remained nearby but did not help.

Five witnesses described what occurred during the approximately five minutes that the three men held appellant and searched for his gun.

*Andres Gonzales* testified he was the last of his friends to cross Normandie and did not touch appellant. While his friends held appellant, appellant denied he had a gun. Appellant yelled at them "Damn you." His friends held but did not hit appellant. Rudolfo Marroquin (Jackie M.'s father and appellant's uncle) arrived and told them to let appellant go. Mr. Gonzales stated he is 5 feet tall and weighs 130 pounds.

*Richard Monterrosa* testified that Carlos Escobar "hugged" appellant, Carlos was behind appellant and had his arm across appellant's throat. He and Alfredo Fuentes searched appellant's pockets and socks, looked in the nearby trash can and the surrounding area but could not find the gun. Appellant resisted, kicked at them, called them "son of a bitch," said "Let go of me. You will get to know who I am." Neither he nor his friends hit appellant. A uniformed security guard was there and they told him to handcuff appellant but he wouldn't. He said he'd call the police and he left. An older man arrived (Rudolfo Marroquin), told them to let appellant go, and started "punching at us, so we pushed him."

*Manuel Lualhati* was in his second floor apartment at 548 Normandie when he heard a commotion outside. He went to his street facing windows, saw appellant chase Julio Sandoval, heard gunshots, saw appellant stop by the minimall cement trash container and then saw and heard five Spanish-speaking men cross Normandie and go toward the minimall. One of the five "tried to put his arm on the gunman's neck . . . ," they put appellant against the wall by the trash container and frisked him. The men were looking around the ground, checking the trash can and bus benches. Two men held the gunman. "One of the guys tried to hit [appellant]." Lualhati couldn't tell if he made contact. Appellant was resisting. A security guard just stood there.

*Julio Sandoval* testified that after he was punched and shot at by appellant he ran into the minimall parking lot and continued running around the block.

Then he jumped on a fence, climbed onto a cafe roof about 20 feet above the ground, looked down and saw appellant arguing with 4 men. Rudolfo Marroquin tried to back two of the men out. One of the men tried to start a fight with Rudolfo Marroquin by saying "What is wrong with you?" No punches were thrown, no one was kicked. The four men were getting separated from each other.

*Jackie M.* testified she was nearby when appellant was held by the Hispanic men. She said they held him against the wall near the cement trash container and three or four of them beat appellant. "They were punching him and searching him through his pockets." They were trying to hold appellant and he was struggling. No one hit appellant in the face and appellant did not fall to the ground.

As to what happened next, when the men released appellant, there was *no* witness discrepancy.

Because they couldn't find the gun and because the security officer wouldn't arrest appellant, the men let appellant go. Appellant then said, "Now you'll see, you sons of whores." The men started to walk away, appellant backed up about six feet, took out his gun and started firing. One shot hit Alfredo Fuentes in the chest and killed him. Another hit Andres Gonzales in the leg.

A short time later the police arrested appellant at the 541 South Normandie apartment where Rudolfo Marroquin and Jackie M. lived. His gun was on the floor, in a corner. It had four casings and one live round. As a firearms expert explained, after each shot one had to manually rotate the cylinder in order to fire the next shot.

Rudolfo Marroquin and Jackie M. were with appellant when he was arrested. She saw no bruises on or injuries to appellant. A booking photograph of appellant also showed none.

Two of the four surviving Hispanic men testified, Richard Monterrosa and Andres Gonzales. Two did not: Carlos Escobar and Leonardo Gil. Also not testifying were Rudolfo Marroquin and appellant. The only witness called by the defense was Jackie M. Her defense testimony (she initially testified as a prosecution witness) was limited to identifying Mr. Monterrosa as the person who picked a fight with her father.

DISCUSSION

Appellant contends the trial court had a sua sponte duty to instruct on imperfect self-defense. (*People* v. *Flannel, supra,* 25 Cal.3d 668; CALJIC No. 5.17.[2]) The contention is divisible into several parts.

1.  *Did 1981 legislation and Proposition 8 eliminate the imperfect self-defense doctrine?*

In 1981 "Senate Bill No. 54 added to the Penal Code sections 28 and 29, which abolished diminished capacity and limited psychiatric testimony. It amended section 22 on the admissibility of evidence of voluntary intoxication, section 188 on the definition of malice aforethought, and section 189 on the definition of premeditation and deliberation. Other sections . . . were also amended." (*People* v. *Saille* (1991) 54 Cal.3d 1103, 1111 [2 Cal.Rptr.2d 364, 820 P.2d 588].)

As *People* v. *Saille* explained, diminished capacity and malice aforethought were interrelated. " 'To explain how diminished capacity negated malice, we redefined and expanded the mental component of malice aforethought beyond that stated in section 188 to include a requirement that the defendant was able to comprehend the duty society placed on all persons to act within the law, i.e., that he had an "awareness of the obligations to act within the general body of laws regulating society.' " (54 Cal.3d at p. 1110, quoting *People* v. *Conley* (1966) 64 Cal.2d 310, 322 [49 Cal.Rptr. 815, 411 P.2d 911].)

This expanded mental component of malice aforethought was eliminated by the 1981 amendment to section 188. As amended, the section reads: "Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.

"When it is shown that the killing resulted from the intentional doing of an act with express or implied malice as defined above, no other mental state

---

[2]The instruction reads: "A person, who kills another person in the honest but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury, kills unlawfully, but does not harbor malice aforethought and is not guilty of murder. This would be so even though a reasonable person in the same situation seeing and knowing the same facts would not have had the same belief. Such an honest but unreasonable belief is not a defense to the crime of voluntary or involuntary manslaughter."

The trial court instructed on self-defense, voluntary manslaughter, involuntary manslaughter, and misdemeanor exhibiting a firearm (§ 417).

need be shown to establish the mental state of malice aforethought. Neither an awareness of the obligation to act within the general body of laws regulating society nor acting despite such awareness is included within the definition of malice."

The Attorney General argues that since *Flannel* based its imperfect self-defense doctrine on this expanded mental component of malice,[3] its elimination (§ 188) "fundamentally undermine[d]" *Flannel.*

Although there may be merit to this argument, for several reasons we decline to adopt it. First, our Supreme Court has expressly recognized but not decided the issue. (*People* v. *Saille, supra,* 54 Cal.3d 1103, 1107, fn. 1 ["Another type of nonstatutory voluntary manslaughter—the so-called 'imperfect self-defense' doctrine—has been recognized in California. That doctrine applies to reduce an intentional killing from murder to manslaughter when a person kills under an honest but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury. (*People* v. *Flannel* (1979) 25 Cal.3d 668, 674-680 [160 Cal.Rptr. 84, 603 P.2d 1]; *People* v. *Van Ronk* (1985) 171 Cal.App.3d 818, 823 [213 Cal.Rptr. 581].) This doctrine has no application to the facts before us, and we do not decide whether it has been affected by Proposition 8 and the 1981 legislation."].)

Second, although, as we have noted, *Flannel* relied upon the expanded mental component of malice in formulating its imperfect self-defense doctrine, its reliance was only *partial.* Independent of this expanded mental component and independent of diminished capacity, *Flannel* regarded imperfect self-defense as a factor which—just like "the statutorily suggested 'sudden quarrel or heat of passion'—can negate malice aforethought. . . ."

---

[3]"The nature of malice is central here for '[m]urder is the unlawful killing of a human being . . . with malice aforethought' (Pen. Code, § 187); '[m]anslaughter is the unlawful killing . . . , without malice.' (Pen. Code, § 192.) In *Conley* we examined the meaning of that mental state. We observed that a person who carefully weighs a course of action, and chooses to kill after considering reasons for and against, is normally capable of comprehending his societal duty to act within the law. 'If, *despite such awareness,* he does an act that is likely to cause serious injury or death to another, he exhibits that wanton disregard for human life or antisocial motivation that constitutes malice aforethought.' (Italics added.) (64 Cal.2d at p. 322.)

"Given this understanding of malice aforethought, we cannot accept the People's claim that an honest belief, if unreasonably held, can be consistent with malice. No matter how the mistaken assessment is made, an individual cannot genuinely perceive the need to repel imminent peril or bodily injury and simultaneously be aware that society expects conformity to a different standard. Where the awareness of society's disapproval begins, an honest belief ends. It is the honest belief of imminent peril that negates malice in a case of complete self-defense; the reasonableness of the belief simply goes to the justification for the killing." (*People* v. *Flannel, supra,* 25 Cal.3d 668, 679, fn. omitted.)

(*People* v. *Flannel, supra,* 25 Cal.3d at p. 672.)[4] Of course, *if* the doctrine of imperfect self-defense is viable independent of the expanded mental component of malice (§ 188), then it survived the 1981 legislation and Proposition 8. Whether or not imperfect self-defense may stand on only one of its original two legs should be decided, if possible, by its creator—the California Supreme Court.

Third, it is not necessary to the determination of this appeal that we decide the matter.

Accordingly, we assume, *without deciding,* that the 1981 legislation and Proposition 8 did not eliminate the imperfect self-defense doctrine.

2.  *If omitting imperfect self-defense instructions was error, did appellant invite that error?*

Before deciding what instructions it should give, the trial court asked counsel to research *Flannel.* After some preliminary discussion the following colloquy occurred:

"[Defense counsel]: Your Honor, in the list I submitted to the court, I am not going to be requesting that instruction, which is 5.17. [See fn. 2.] I reached the conclusion that it doesn't apply.

"The Court: You are not requesting then, that the jury be instructed along the lines of the Flannel case?

"[Defense counsel]: No."

■ Notwithstanding appellant's trial court position that CALJIC No. 5.17 *not* be given, appellant contends its omission was error. If appellant "invited" its omission he waived any error.

The test for instructional "invited error," as stated by *People* v. *Graham* (1969) 71 Cal.2d 303, 318 [78 Cal.Rptr. 217, 455 P.2d 153] requires that "defense counsel deliberately and expressly, as a matter of trial tactics,

---

[4] "California decisions long have acknowledged that factors other than the statutorily suggested 'sudden quarrel or heat of passion' can negate malice aforethought, the mental element necessary for murder. Most of these cases, of course, applying the doctrine of diminished capacity, hold that evidence of intoxication, mental defect, or disease can rebut malice. Other decisions, including those of this court, recognize, albeit without full discussion, that one who holds an honest but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury does not harbor malice and commits no greater offense than manslaughter." (*People* v. *Flannel, supra,* at p. 672.)

objected to the rendition of an instruction." Recent California Supreme Court cases have eased the "expressly" requirement and have found "invited error" where tactical objection was inferable from the record. (*People* v. *Duncan* (1991) 53 Cal.3d 955, 969-970 [281 Cal.Rptr. 273, 810 P.2d 131] [All-or-nothing tactical strategy]; *People* v. *Cooper* (1991) 53 Cal.3d 771, 827 [281 Cal.Rptr. 90, 809 P.2d 865] [All-or-nothing tactical strategy]; *People* v. *Whitt* (1990) 51 Cal.3d 620, 641 [274 Cal.Rptr. 252, 798 P.2d 849] ["Death row" redemption strategy].) We have examined the record and have found no implied tactic or strategy which explains appellant's opposition to CALJIC No. 5.17. The Attorney General concedes the point.

We conclude there was no invited error.

3.  *Was there substantial evidence of imperfect self-defense?*

■   If there was substantial evidence of imperfect self-defense not inconsistent with the defense theory of the case, the trial court had a sua sponte duty to give such an instruction. (*People* v. *Wickersham* (1982) 32 Cal.3d 307, 326 [185 Cal.Rptr. 436, 650 P.2d 311].)   ■   Here, there is no issue concerning "not inconsistent with the defense theory of the case."

■   Also not in issue is the legal significance of the defendant not testifying. Substantial evidence of a defendant's state of mind, including an "honest but unreasonable belief in the necessity to defend against imminent peril to life" (CALJIC No. 5.17), may be present *without* defendant testimony. (*People* v. *Castillo* (1987) 193 Cal.App.3d 119, 126 [238 Cal.Rptr. 207]; *People* v. *Anderson* (1983) 144 Cal.App.3d 55, 62 [192 Cal.Rptr. 409].)

■   Those hurdles cleared, appellant points to an instruction that *was* given: self-defense. It follows, he argues, that if the trial court found substantial evidence of self-defense (not *imperfect* self-defense) there was, *necessarily*, substantial evidence of *imperfect* self-defense. This is so because self-defense requires both an honest *and* reasonable belief in imminent peril while *imperfect* self-defense requires only an honest belief.

It is hard to fault appellant's logic. If there was substantial evidence of his "honest belief" for self-defense purposes, there was substantial evidence of his "honest belief" for *imperfect* self-defense purposes.

But we are satisfied, and so hold, there was not substantial evidence of "honest belief" for either self-defense or imperfect self-defense.

As our detailed description of the evidence makes clear, appellant, without provocation, initiated an attack upon Julio Sandoval. When Mr. Sandoval

fled, appellant pursued him, firing his weapon. It was that pursuit and those shots which caused Mr. Monterrosa and his companions to attempt to disarm appellant. There was no evidence appellant was ignorant of their purpose. Mr. Fuentes *said*, "Let's take the gun away from him . . ." and appellant told them he had no gun. All the witnesses, even appellant's cousin Jackie M., observed the men search for the gun.

Nor was there evidence that during the five-minute detention and search of appellant he might have believed he was imperiled. His cousin Jackie M. and uncle Rudolfo Marroquin were present and in plain sight, yet he never called to them for help. Nor was he prevented from doing so by Carlos Escobar's restraining arm. Appellant had no difficulty, during those five minutes, in cursing and threatening Mr. Monterrosa and the others.

Jackie M. did testify that the men punched appellant. But she also admitted she had made no such claim when interviewed that night at the police station. Further she said none of the blows were to appellant's face, she saw no bruise or injury, and appellant did not fall down.

But even if Jackie M.'s testimony constituted substantial evidence appellant feared for his safety *while restrained*, it did not constitute substantial evidence of such fear once appellant was released.

The evidence only showed his anger and his intent to fulfill earlier threats ("Now you'll see, you sons of whores.") by appellant immediately pulling out his weapon and firing at men who had turned and started to walk away.

We find that at the time appellant fatally shot Alfredo Fuentes and wounded Andres Gonzales, there was no substantial evidence he honestly believed he was in imminent peril. Accordingly, the trial court properly omitted giving CALJIC No. 5.17.

DISPOSITION

The judgment is affirmed.

Lillie, P. J., concurred.

JOHNSON, J.—I concur separately merely to emphasize I do so only because I conclude there was *not* substantial evidence in the record supporting a claim of self-defense—reasonable or unreasonable. Hence, the trial court erred in giving the "reasonable" self-defense instruction and did not err in failing to give the "unreasonable" self-defense instruction. In the circumstances of this case, however, had there been sufficient evidence to support the former, it would have been error to refuse to give the latter.

Since I find no error in the refusal to instruct on unreasonable self-defense and agree with the remainder of the majority opinion, I concur in the judgment.

A petition for a rehearing was denied November 24, 1992, and appellant's petition for review by the Supreme Court was denied January 28, 1993.