Filed 3/3/15  P. v. Beuchel CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>   Plaintiff and Respondent,<br><br>   v.<br><br>NOAH OTTO BEUCHEL,<br><br>   Defendant and Appellant. | B251481<br><br>(Los Angeles County<br>Super. Ct. No. BA399361) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Monica Bachner, Judge.  Affirmed with modifications.

Jonathan E. Demson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Margaret E. Maxwell and Eric E. Reynolds, Deputy Attorneys General, for Plaintiff and Respondent.

* * * * * *

Defendant Noah Otto Beuchel challenges his conviction for second degree murder. He argues that jurors should have been instructed on the lesser included offense of manslaughter. We disagree and affirm. We modify his sentence to add one day of custody credit.

## FACTS AND PROCEDURE

Defendant was a member of the Pinoy Real gang. On January 12, 2012, late at night, he walked with his friend Benjamin Tan from his grandmother's home to a nearby store. En route, defendant shot and killed rival Temple Street gang member Cesar Gonzalez. Gonzalez died of multiple gunshot wounds. An autopsy showed that Gonzalez's blood alcohol level was between 0.16 and 0.2 percent (depending on the location of the test), and he tested positive for a byproduct of methamphetamine.

Two eyewitnesses, Maria Fernandez—Gonzalez's girlfriend—and defendant's friend and codefendant Tan testified at trial.

### 1. Maria Fernandez

Fernandez testified that on January 12, 2012, as they waited for a bus, Gonzalez removed his hat, revealing tattoos of horns on his head. Fernandez asked him to cover his head to hide the tattoos. Fernandez's testimony was inconsistent as to whether Gonzalez complied with her request.

As Gonzalez and Fernandez waited for the bus, Gonzalez asked an unidentified man "where are you from," which is jargon for asking him whether he belonged to a criminal street gang. Gonzalez told the man that he was from Temple Street (referring to the name of his criminal street gang) and that "this is Temple Street." Fernandez told Gonzalez to leave the man alone. The man appeared frightened and left the bus stop.

When defendant and Tan passed Gonzalez, defendant asked Gonzalez "where are you from," again referring to his gang membership.[1] Gonzalez responded that he was

---

[1] Although Fernandez identified defendant as the person who asked Gonzalez about his gang membership, she also identified Tan.

2

from Westside Temple and his moniker was Little Devil. Tan pushed Fernandez. Defendant shot Gonzalez. Defendant and Tan then fled.

Fernandez testified that Gonzalez was physically imposing and had tattoos of tear drops near his eye.

## 2. Tan

Tan testified that he was a former member of the Pinoy Real gang and had gang tattoos. After his daughter's birth, he tried to separate from the gang and began having his tattoos removed.

On January 12, 2012, Tan decided to accompany defendant to the store. As they neared the bus stop where Gonzalez and Fernandez were standing, Tan had a "bad feeling." Tan was concerned that Gonzalez would ask him "where [he's] from" and "try to fight [him] after." Although Tan thought Gonzalez would ask where he was from, Gonzalez did not.

Gonzalez followed defendant and Tan and said "Temple." Tan said "all right. All right. It's cool." Gonzalez, who was wearing gang attire, responded that this is "Westside Temple Street." Tan said "don't trip," by which he meant "no problem." Appearing upset, Gonzalez repeated "Temple" and displayed a gang sign. Tan thought Gonzalez was going to punch his face.

When Tan thought it was safe to continue to the store, he began crossing the street, and then he heard a gunshot. Tan turned around and saw defendant shoot Gonzalez. Tan testified Gonzalez never hit him or defendant. Gonzalez never displayed any weapon. Tan did not see Gonzalez threaten defendant. According to Tan, violence may easily ensue from a challenge by a gang member. Tan also testified that a gang member supports his gang by fighting a rival gang member and killing a rival gang member.

## 3. Other Evidence

A gang expert testified that gangs by their very nature are violent. Shooting someone who disrespected a gang is "putting in work for the gang." The most common way to "put in work for a gang is to commit violent crimes." A "hit-up" is when one gang member asks another gang member about his gang membership. Typically, a gang

member asks "where are you from." "A stabbing or shooting will usually occur subsequent to the hit-up."

Gonzalez had numerous tattoos. As noted, he had devil horns on his head. The teardrop under his right eye might signify that he killed someone or that he lost a friend. Gonzalez had a spider web tattoo and a star in a circle. A spider web tattoo can mean a person spent time in prison and assaulted or killed someone. Gonzalez's taking off his hat to show his horns may have been a means to claim the area he was in as territory for his gang.

## 4. *Conviction and Sentence*

Defendant was convicted of second degree murder. Firearm enhancements under Penal Code section 12022.53, subdivisions (b), (c) and (d) were found true. The gang enhancement was found not true. Tan was found not guilty. The court sentenced defendant to an aggregate term of 40 years to life in prison. The court awarded defendant 426 days of actual custody credits. This appeal followed.

## DISCUSSION

Defendant argues the court should have instructed on manslaughter based on two theories—imperfect self-defense and heat of passion. Both theories would reduce murder to voluntary manslaughter. (*People v. Blacksher* (2011) 52 Cal.4th 769, 832.)

Jurors must be instructed on lesser included offenses supported by substantial evidence. (*People v. Duff* (2014) 58 Cal.4th 527, 562.) Substantial evidence is """"evidence from which a jury composed of reasonable persons could conclude that the facts underlying the particular instruction exist."""" (*People v. Enraca* (2012) 53 Cal.4th 735, 758.)

"A killing with express malice formed willfully, deliberately, and with premeditation constitutes first degree murder. [Citation.] 'Second degree murder is the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder.'" (*People v. Beltran* (2013) 56 Cal.4th 935, 942.)

"Manslaughter is a lesser included offense of murder. [Citations.] The mens rea element required for murder is a state of mind constituting either express or implied malice. A person who kills without malice does not commit murder." (*Ibid.*)

We now turn to whether the trial court was required to instruct on imperfect self-defense or heat of passion. There may be substantial evidence to support such an instruction even if a defendant does not testify. (*People v. De Leon* (1992) 10 Cal.App.4th 815, 824.)

### 1. *Imperfect Self-defense*

"Unreasonable self-defense, also called imperfect self-defense, 'obviates malice because that most culpable of mental states "cannot coexist" with an actual belief that the lethal act was necessary to avoid one's own death or serious injury at the victim's hand.'" (*People v. Beltran, supra*, 56 Cal.4th at p. 951.) "The killing is . . . mitigated because of the defendant's misguided but good faith belief." (*Ibid.*)

Defendant requested the court instruct jurors pursuant to CALCRIM No. 571 which provides: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because (he/she) acted in (imperfect self-defense/ [or] imperfect defense of another). [¶] If you conclude the defendant acted in complete (self-defense/ [or] defense of another), (his/her) action was lawful and you must find (him/her) not guilty of any crime. The difference between complete (self-defense/ [or] defense of another) and (imperfect self-defense/ [or] imperfect defense of another) depends on whether the defendant's belief in the need to use deadly force was reasonable. [¶] The defendant acted in (imperfect self-defense/ [or] imperfect defense of another) if: [¶] 1. The defendant actually believed that (he/she/ [or] someone else/ _____) was in imminent danger of being killed or suffering great bodily injury; AND [¶] 2. The defendant actually believed that the immediate use of deadly force was necessary to defend against the danger; BUT [¶] 3. At least one of those beliefs was unreasonable." The court rejected defendant's request, finding no substantial evidence supported the claimed imperfect self-defense.

5

On appeal, defendant argues his conviction must be reversed because the court erroneously refused to instruct jurors on imperfect self-defense. He argues that his actual belief that he and Tan were in imminent danger of being killed was readily inferable from the circumstances. He emphasizes that Gonzalez was a heavy-set man, identified as a gang member from his multiple tattoos including a spider web and tear drops. He further highlights evidence that Gonzalez had an elevated blood alcohol level and his blood showed that he had used methamphetamine. According to defendant, Gonzalez threatened someone else at the bus stop by asking the man "where are you from." The man, who appeared afraid of Gonzalez, eventually left the bus stop.

Defendant persuasively shows that he *could* have believed he was in danger. Gonzalez was recognizable as a gang member, announced that he was from Temple Street thereby claiming his gang, and showed a gang sign. He was physically imposing. The man at the bus stop left after Gonzalez asked where he was from, suggesting that he may have feared Gonzalez. Tan's testimony showed that Tan had a "bad feeling" when he saw Gonzalez. Tan believed Gonzalez would punch him in the face or "hit him up."

However, defendant fails to identify any evidence supporting his claim that he *actually* believed he or Tan was in imminent danger of being killed or suffering from great bodily injury. Imperfect self-defense requires that the defendant "have had an *actual* belief in the need for self-defense." (*In re Christian S.* (1994) 7 Cal.4th 768, 783.) Defendant did not testify and no witness testified as to his state of mind. Tan did not see Gonzalez do anything to defendant. Even if jurors could have inferred that defendant and Tan shared the same emotions when they encountered Gonzalez, Tan's testimony does not show he feared that he would be killed or would suffer great bodily injury. Tan testified he was afraid defendant would punch him in the face or ask him about his gang membership. Tan believed he was able to diffuse the situation by telling Gonzalez, "don't trip." Nor was there evidence that Tan or defendant believed *deadly force* was necessary to defend against Gonzalez. For all these reasons, the trial court properly concluded the instruction on imperfect self-defense was not warranted.

## 2. *Heat of Passion*

"Heat of passion arises if, '"at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment."'' [Citation.] Heat of passion, then, is a state of mind caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation. While some measure of thought is required to form either an intent to kill or a conscious disregard for human life, a person who acts without reflection in response to adequate provocation does not act with malice." (*Beltran, supra*, 56 Cal.4th at p. 942.) "[P]rovocation is sufficient not because it affects the quality of one's thought processes, but because it eclipses reflection. A person in this state simply reacts from emotion due to the provocation, without deliberation or judgment. If an ordinary person of average disposition, under the same circumstances, would also react in this manner, the provocation is adequate . . . ."[2] (*Id*. at p. 950.)

Defendant argues the evidence that Gonzalez threatened his life and Tan's life indicates the court should have instructed jurors that he acted in the heat of passion. Defendant argues jurors could have inferred that he acted rashly because he panicked without due deliberation and reflection. According to defendant, "the nature of the provocation was an implicit, immediate threat" to his and Tan's life.

The difficulty for defendant was that there was no evidence Gonzalez threatened his life or Tan's life. While defendant could have panicked, for purposes of voluntary manslaughter he must show evidence that he was provoked by acts that would "render an ordinary person of average disposition 'liable to act rashly or without due deliberation and reflection.'" (*Beltran, supra*, 56 Cal.4th at p. 957.) Gang-related challenges are

---

[2] Defendant did not request an instruction on heat of passion but the court is required to instruct sua sponte if the evidence is substantial. (*People v. Enraca, supra*, 53 Cal.4th at p. 758.)

insufficient provocation to require an instruction on voluntary manslaughter. (*People v. Enraca, supra*, 53 Cal.4th at p. 759.) The standard of an ordinary person "is not the reaction of a 'reasonable gang member.'" (*Ibid*.) The evidence that Gonzalez had an elevated blood alcohol level and tested positive for methamphetamine were not probative of whether defendant acted out of passion because there was no evidence that defendant was aware of Gonzalez's drug and alcohol use. Nor was there evidence that Gonzalez's level of intoxication caused him to provoke defendant. Defendant failed to show the court should have instructed jurors on the heat of passion theory for manslaughter.

### 3. Custody Credit

The parties agree that defendant is entitled to one additional day of conduct credit. Appellant was arrested June 28, 2012, and sentenced on August 28, 2013. He was given 426 days of custody credits but should have been given 427 days to reflect the number of days between his arrest and his sentencing.

## DISPOSITION

The sentence is modified to reflect 427 days of custody credit. In all other respects the judgment is affirmed.

FLIER, J.

WE CONCUR:

BIGELOW, P. J.

GRIMES, J.

8