Filed 5/4/26  P. v. Landry CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D087169 |
| Plaintiff and Respondent, | (Super. Ct. No. BAF2000888) |
| v. | |
| MELVIN MARIO JAMES LANDRY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County, Bernard J. Schwartz, Judge.  Affirmed.

Sheila O'Connor, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Collette C. Cavalier, Supervising Deputy Attorney General, James H. Flaherty III, Deputy Attorney General, for Plaintiff and Respondent.

Longtime friends G.W. and Melvin Mario James Landry got into an argument, yelling and exchanging obscenities. G.W. slapped Landry and challenged him to a fight. Landry turned away, retrieved a loaded semi-automatic handgun from his vehicle, racked the gun, and shot G.W. once in the chest, killing him.

After receiving the instruction on heat of passion provocation that reduces murder to manslaughter, a jury convicted Landry of second degree murder (Pen. Code,[1] § 187, subd. (a)) and found true that Landry personally and intentionally discharged a firearm and proximately caused great bodily injury or death to another person (§ 12022.53, subd. (d)). The trial court sentenced Landry to an aggregate term of 40 years to life, plus two years in state prison.

On appeal Landry contends that the conviction must be reversed because: (1) the prosecutor committed misconduct by misstating the law regarding heat of passion provocation during closing argument; (2) the trial court erred by failing to instruct the jury as to imperfect self-defense; and (3) no substantial evidence supported the jury's second degree murder verdict.

We affirm the conviction.

FACUAL AND PROCEDURAL BACKGROUND

A. *The Shooting*

On July 22, 2020, G.W. and his common law wife, O.J., went to her father's house in Riverside to pick up their kids and visit with family. G.W. and O.J. had been together for over 20 years and had three kids together.

---

[1]     Further undesignated references are to the Penal Code.

2

O.J.'s sister, S.J., and her husband Landry were already at the house with their own kids. S.J. and Landry had been together since S.J. was 17 years old and had been married since 2014. They had five kids together.

G.W. and Landry had known each other apart from their relationship through the sisters. They were like brothers. The sisters were also close. At one point, the four of them had lived together when the sisters were pregnant at the same time. The two couples socialized together every weekend or every other weekend. Over the course of their long friendship, G.W. and Landry would argue over small things or exchange words in passing. But they had always resolved their disagreements and their arguments had never gotten physical. O.J. described her brother-in-law Landry as a humble person and peaceful.

S.J. testified her husband Landry had issues with drinking. He drank more than one bottle of liquor every day. Prior to the shooting, Landry was drinking more because they were having marital issues due to Landry's infidelity. They had recently separated because Landry had cheated on her, but still lived in the same house. When he was drunk, he became unapproachable and angry.

On July 22, 2020, S.J. and Landry were already drinking when O.J. and G.W. arrived at the house. O.J. and G.W. joined them. All four of them were drinking Hennessy, and all of them except Landry were also smoking marijuana. At some point G.W. and Landry left together. When they returned there was more drinking and dancing.

Both couples had separately planned to spend the night at a nearby hotel instead of staying in S.J. and O.J.'s father's house. When they got to the hotel, the rooms were not available, and they all returned to the house.

3

After they returned, they resumed drinking and dancing as they sat outside the house. O.J. thought G.W. and Landry were discussing relationships, and told the police they were talking "about some real shit." O.J. knew Landry and S.J. were having issues, but she did not know the details. S.J. noticed her husband Landry had become standoffish, quiet, and angry, the state he reached when drunk.

Testifying for the defense, S.J. said she observed her husband ingest a white powder through his nostrils that evening. She said she saw him do it at least four times. She knew it was cocaine because she had seen him use it before. She did not tell this to police in her interview right after the incident and first mentioned it at trial, four years after the shooting. O.J. testified she did not see Landry use cocaine that night.

Sometime that evening, G.W. and Landry got into an argument. They started yelling at each other. At the time, everyone was standing on the sidewalk. O.J.'s Toyota Camry was parked on the street and Landry's Dodge Durango was parked in the driveway.

O.J. did not remember what the argument was about, but she heard G.W. call Landry a "bitch," "pussy," and the "N word." Landry called G.W. the "N word" at least once.

G.W. slapped Landry, took off his shirt and challenged Landry to a fight. S.J. yelled at G.W., "Why would you do that?" The sisters intervened and tried to separate the two men. G.W. was standing near the Durango in the driveway and Landry was standing in the street. The sisters were between them.

O.J. testified that Landry became "upset" after the slap. Landry exchanged more words with G.W., then walked to his vehicle. Landry opened the rear driver side door of his Durango, reached for something, and turned

4

and walked towards G.W. To O.J. it looked like Landry had something in his hand, but she could not tell what it was at first. Landry then cocked or racked what turned out to be a gun. When she saw Landry rack the gun, O.J. tried to stop him.

Landry reached around O.J., who was standing in front of him, and fired at G.W., behind her. O.J. was so close that her ears were ringing. Blood got on the back of O.J.'s skirt Landry shot G.W. once in the chest. There were no other shots fired.

S.J., who was facing G.W., heard a loud bang and saw a "flash of light" coming from behind her. G.W. looked at her and asked, "Am I shot?" S.J. asked, "Are you okay?" and tried to hold him up.

O.J. screamed and ran toward Landry to stop the shooting. She chased him around the front of the Camry but she fell to the ground. Landry walked toward the Durango, got into the vehicle, backed out of the driveway, and drove away.

O.J. got up off the ground and went over to where S.J. was holding up G.W. They tried to get him into O.J.'s Camry to go to the hospital but he was too heavy. O.J. called 911 and started CPR. A sheriff's deputy arrived at about 3:30 a.m. and took over CPR. G.W. was declared dead at 3:45 a.m. on July 23, 2020.

S.J. called Landry and told him that G.W. was dead. Landry agreed to return and surrender to the police. S.J. did not know where he was or what he did with the gun.

Around 8:25 a.m., Landry returned to the scene in the Durango. Landry did not appear to be under the influence of alcohol or a controlled substance at that time. Sherriff's department investigators searched the

5

Durango but did not find a gun or any bullet casings in it, or at the scene. No firearm or casings were ever recovered in the case.

A neighbor's security camera recorded a video of the shooting, which was shown to the jury. The beginning of the video captured the sound of a car starting and music playing. At about 39 seconds into the video, the sound of a slap can be heard, followed by a thud or a thump, according to witnesses. None of the witnesses could explain what occurred to cause the thump. A verbal confrontation ensued. G.W. yelled obscenities and taunted Landry. Landry responded in kind. According to the video, G.W. told Landry to "Pull it out," "hit me," and "shoot me." At timestamp 1:21 on the video, witnesses heard the sound of a gun being racked. Four seconds later, at timestamp 1:25, the gun was fired..

Based on the investigator's knowledge of firearms, the racking of the gun meant it was a semi-automatic firearm. Before it was racked there was not already a bullet in the chamber ready to fire.

A medical examiner testified that the cause of G.W.'s death was a single gunshot wound to the heart.

B. *Prior Proceedings*

In a February 2024 trial, a jury convicted Landry of being a felon in possession of a firearm, in violation of section 29800, subdivision (a)(1) (count 2). The jury could not reach a verdict on the first degree murder charge (count 1) and the court declared a mistrial. A second trial was conducted in May 2024 solely on the murder charge. The jury convicted Landry of second degree murder.

DISCUSSION

A. *The Prosecutor's Arguments on Provocation*

Landry contends that the prosecutor committed prejudicial misconduct in misstating the law on provocation. We agree that the prosecutor made misstatements, but his counsel failed to object and thus Landry has forfeited this claim. Since Landry has not shown prejudice, we conclude the failure to object did not constitute ineffective assistance of counsel.

1. *Legal Principles*

A prosecutor's conduct during a criminal trial violates the federal Constitution if it is " 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.' " (*People v. Gionis* (1995) 9 Cal.4th 1196, 1214.) It violates the California Constitution if it "involves ' " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' " (*Ibid.*) Where, as here, the prosecutor is alleged to have misstated the law to the jury, this constitutes error if (1) the prosecutor misstated the law, and (2) there is " 'a reasonable likelihood the jury understood or applied the [prosecutor's remarks] in an improper or erroneous manner.' " (*People v. Centeno* (2014) 60 Cal.4th 659, 667 (*Centeno*).)

Although we generally review claims of prosecutorial error for an abuse of discretion, we independently examine what the law is and "objective[ly]" examine how a "reasonable juror" would likely interpret the prosecutor's remarks, bearing in mind that " ' "we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements." ' " (*People v. Collins* (2021) 65 Cal.App.5th 333, 340 (*Collins*).)

7

Murder is the unlawful killing of a human being with malice aforethought. (See § 187, subd. (a).) Malice is presumptively absent when the defendant acts upon a sudden quarrel or heat of passion on sufficient provocation. (§ 192, subd. (a).)

Heat of passion requires that the provocation caused "an emotion so intense that an ordinary person would simply *react*, without reflection" and can include " ' " ' "[v]iolent, intense, high-wrought or enthusiastic emotion." ' " ' " (*People v. Beltran* (2013) 56 Cal.4th 935, 949-950 (*Beltran*).)

Heat of passion includes both subjective and objective components. (*People v. Moye* (2009) 47 Cal.4th 537, 549-550.) The subjective component of heat of passion requires that the defendant killed while under " 'the actual influence of a strong passion' " induced by legally sufficient provocation. (*Id.* at p. 550; *People v. Manriquez* (2005) 37 Cal.4th 547, 583–584 (*Manriquez*).)

As to the objective component, the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly and without due deliberation and reflection. (*People v. Barton* (1995) 12 Cal.4th 186, 202 (*Barton*).) Put another way, the provocation " 'must be such that an average, sober person would be so inflamed that he or she would lose reason and judgment.' " (*Manriquez, supra,* 37 Cal.4th 547 at pp. 585-86.) This objective component prevents the defendant from "set[ting] up his own standard of conduct" to justify his actions. (*People v. Steele* (2002) 27 Cal.4th 1230, 1252.) Accordingly, the focus is on the nature of the provocation and whether it was sufficient to cause a reasonable person to act rashly. How a defendant actually responded to the provocation, and the reasonableness of that response, are not relevant to assessing the adequacy of the provocation. (*People v. Najera* (2006) 138 Cal.App.4th 212, 223 (*Najera*).)

"Framed another way, provocation is not evaluated by whether the average person would *act* in a certain way: to kill.  Instead, the question is whether the average person would *react* in a certain way: with his reason and judgment obscured."  (*Beltran, supra*, 56 Cal.4th at p. 949.)  It is thus a misstatement of the law to argue that the provocation would only be legally sufficient if it would have caused a reasonable person to kill the provoker.  (*Ibid*.)

2.  *The Prosecutor's Statements*

The prosecutor here repeatedly misstated the law by arguing that the proper standard for assessing the adequacy of provocation is whether an ordinary person of average disposition would be moved to kill, and to kill in the precise manner Landry did.  In his initial closing and rebuttal, the prosecutor made at least four incorrect statements of the law of provocation, two of which the Attorney General concedes.

In his initial closing argument the prosecutor made the following misstatements:

1.  "So how do we know [Landry] intended to do it?  [He] [g]oes over to the Dodge Durango after the slap . . . [which shows he is] able to walk away from the slap, and the slap didn't provoke him such that it would require a killing."

2.  To satisfy provocation, "an average person's passions would have had to have been aroused so much so that that was the reasonable response, shooting in light of a slap.  That's basically—that's the argument for provocation to reduce it, slaps now equal okay to murder."

In his rebuttal closing, the prosecutor added the following misstatements:

9

3. "[A] person of average disposition does not react to a slap by arming themselves with a firearm, walking over step-by-step, closing the distance, avoiding two other people, and shooting another individual in the heart."

4. "A slap from a person of average disposition, having an argument with a friend would not react from passion rather than judgment and shoot their friend in the chest."

The Attorney General acknowledges that statement Nos. 2 and 4 are incorrect. We conclude all four are misstatements. By misstating the law, the prosecutor committed error. (*Centeno*, *supra*, 60 Cal.4th at p. 666.)

Landry's trial counsel did not object at trial to any of the challenged statements. To preserve for appeal a claim of prosecutorial misconduct, the defendant must make a timely objection at trial and request an admonition to the jury. (*Najera*, *supra,* 138 Cal.App.4th at p. 224.) A defendant's failure to object or request an admonition is excused if either would have been futile. *(Ibid.)*

A prosecutor's misstatements of law are generally curable by an admonition from the court. (*People v. Bell* (1989) 49 Cal.3d 502, 548.) In this case, making objections and requesting an admonition would not have been futile. The trial court could have immediately corrected misleading or inaccurate statements of the law and could have warned the prosecutor not to repeat them. (*Najera, supra*, 138 Cal.App.4th at p. 224.) Had defense counsel requested admonitions on the law of provocation, there is every indication the trial court would have given them, as it did when Landry's counsel objected that the prosecutor misstated the reasonable doubt standard. (Cf. *Collins, supra,* 65 Cal.App.5th at pp. 339–340 [defendant

10

objected repeatedly, and "implored" the court to give a supplemental instruction after rebuttal, but the trial court refused].)

Defense counsel's failure to timely object and request admonishment therefore bars Landry from challenging the prosecutor's comments on direct appeal. (*Najera, supra,* 138 Cal.App.4th at p. 224.)

3. *Right to Effective Assistance of Counsel*

A defendant whose counsel did not object at trial to alleged prosecutorial misconduct can argue on appeal that counsel's inaction violated the defendant's constitutional right to the effective assistance of counsel. (*People v. Lopez* (2008) 42 Cal.4th 960, 972.)

Landry advances that claim here. He bears the burden of showing by a preponderance of the evidence that (1) counsel's performance was deficient because it fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficiencies resulted in prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 694 (*Strickland*).)

"Unless a defendant establishes the contrary, we shall presume that 'counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy.' " (*People v. Ledesma* (2006) 39 Cal.4th 641, 746.) When the record on direct appeal sheds no light on why counsel failed to act in the manner challenged, defendant must show that there was " ' "no conceivable tactical purpose" ' " for counsel's act or omission." (*People v. Lewis* (2001) 25 Cal.4th 610, 675.) Ordinarily, " 'the decision . . . whether to object to comments made by the prosecutor in closing argument is a highly tactical one.' " (*People v. Johnsen* (2021) 10 Cal.5th 1116, 1165 (*Johnsen*).)

Conceivable tactical reasons exist for counsel's decision not to object to the prosecutor's misstatements. Defense counsel herself recited the correct

11

provocation standard in her closing, which the prosecutor cited in his rebuttal. (See *Johnsen, supra,* 10 Cal.5th at p. 1165 [defense counsel was not ineffective where, instead of registering a contemporaneous objection, he made a tactical choice to undermine the prosecutor in his own closing remarks].) An objection might have served merely to draw the jury's attention to minor parts of the prosecutor's lengthy closing. (See *People v. Planchard* (2025) 109 Cal.App.5th 157, 176 [defense counsel may make a tactical decision that " ' "objection or other responses would serve only to highlight the undesirable testimony." ' "].) When the prosecutor made similar misstatements during his rebuttal argument, defense counsel may have made a strategic decision to rely on the counterarguments she had already made during her closing statement rather than objecting to the prosecutor's rebuttal statements. As the California Supreme Court concluded when presented with a similar situation in *Johnsen, supra,* 10 Cal.5th at p. 1165, such a tactical choice was not objectively unreasonable under *Strickland, supra,* 466 U.S. 668. (Cf. *Centeno, supra,* 60 Cal.4th at p. 676 [no conceivable reason not to object when the prosecutor mischaracterized the reasonable doubt standard for the first time during rebuttal, since there would be no opportunity for defense counsel to respond].)

Even if the failure to object were an error, we conclude Landry has failed to meet his burden to show prejudice under *Strickland*, which requires a reasonable probability that, but for the alleged errors, the result would have been different. (*Strickland, supra,* 466 U.S. at p. 694.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Ibid.*)

Landry contends that the prosecutor's "misleading arguments made it more likely the jurors would find [Landry] acted with malice aforethought

12

even if the prosecutor failed to prove beyond a reasonable doubt that [Landry] did not kill [G.W.] because he was provoked," and that the prosecutor's arguments "caus[ed] the jury to reject a finding of provocation and convict Landry of murder."

We are not persuaded. While the prosecutor made incorrect statements of the law, those statements were interspersed with correct statements of the law, drawn directly from the jury instructions. As a result, the prosecutor's argument may have caused confusion, but it did not leave the jury with the wrong law or otherwise raise the concern that Landry was convicted by an improperly instructed jury. Nor is it probable that the result would have been more favorable for Landry had the jury been admonished not to consider the prosecutor's remarks.

First, the court's instruction using CALCRIM No. 570 correctly set forth the law of provocation and heat of passion. The instruction informed the jury that the provocation "would have caused a person of average disposition to act rashly and without due deliberation . . . ." (CALCRIM No. 570.) The prosecutor referred to this instruction during portions of his closing arguments, and repeatedly suggested that the jury refer to the written instructions. When he did recite the law correctly, he used the language of the jury instructions. (Cf. *People v. Medellin* (2020) 45 Cal.App.5th 519, 535-536 [where "CALCRIM definition did not clarify [a] point" on which the prosecutor made misstatement, error was prejudicial].)

Second, the jury was repeatedly told orally and in writing that "[n]othing that the attorneys say is evidence." (CALCRIM No. 222.) The court told the jury that it must follow the law as explained by the court, and that if the attorneys' comments on the law conflicted with the court's instructions, the jury was bound to follow the instructions. (CALCRIM Nos.

13

222, 200.)  In its admonishment when the defense counsel objected to another statement by the prosecutor, the court explained, "The lawyers, obviously, are allowed to take some advantage of how they want to explain what they believe the instruction means, but ultimately, it's your resolution and your understanding of the instruction based on the law that I've given you.  So you have to follow the law as I've given you."  While the court was specifically addressing the instruction on reasonable doubt, the jury would have no basis to believe the rule would differ as to any other jury instruction.

"[W]e presume that the jury relied on the instructions, not the arguments, in convicting defendant."  (*People v. Morales* (2001) 25 Cal.4th 34, 47; *People v. Boyette, supra,* 29 Cal.4th at p. 436.)  "Arguments by counsel 'generally carry less weight with a jury than do instructions from the court.  The former are usually billed in advance to the jury as matters of argument, not evidence, [citation], and are likely viewed as the statements of advocates; the latter . . . are viewed as definitive and binding statements of the law.'"  (*People v. McDowell* (2012) 54 Cal.4th 395, 438.)  Given the foregoing, it is not reasonably probable the jury disregarded the trial court's instructions in favor of the prosecutor's formulation of the law.  (See *Najera, supra,* 138 Cal.App.4th at p. 224 [where the prosecutor "interspersed" incorrect statements of the law with correct ones, court presumed the jury relied on the court's instructions].)

Third, as was the case in *Beltran*, here, "[g]iven the strong evidence supporting defendant's murder conviction and the comparatively weak evidence of any legally adequate provocation, a different result was not reasonably probable."  (*Beltran, supra*, 56 Cal.4th at p. 957.)

The jury heard that G.W. exchanged obscenities and name-calling with Landry, slapped him and challenged him to a fight.  These are not the type of

14

provocations that the law generally identifies as sufficient to cause a reasonable person to react rashly from passion rather than from judgment. " ' "A provocation of slight and trifling character, such as words of reproach, however grievous they may be, or gestures, or an assault, or even a blow, is not recognized as sufficient to arouse, in a reasonable man, such passion as reduces an unlawful killing with a deadly weapon to manslaughter." ' " (*Najera*, supra, 138 Cal.App.4th at p. 226.)  Simple assault does not rise to the level of provocation necessary to reduce murder to voluntary manslaughter.  (*People v. Gutierrez* (2009) 45 Cal.4th 789, 826–827 [scratching the defendant's chest, kicking him and grabbing his shirt does not constitute legally sufficient provocation]; see also *Manriquez, supra,* 37 Cal.4th at p. 585 [calling defendant a " 'mother fucker,' " taunting him, and repeatedly asserting that if defendant had a weapon, he should take it out and use it, "plainly were insufficient to cause an average person to become so inflamed as to lose reason and judgment"]; *Najera, supra*, 138 Cal.App.4th at p. 226 [calling defendant a "faggot," pushing him to the ground, and fighting with him "would not drive any ordinary person to act rashly or without due deliberation and reflection"].)

More significantly, the jury heard little evidence that Landry actually, subjectively, shot G.W. in a heat of passion provoked by G.W.'s taunts and slap.  A defendant need not testify to establish heat of passion; circumstantial evidence is often relied upon to reveal a killer's state of mind.  (*People v. Bloom* (1989) 48 Cal.3d 1194, 1208.)  Here, Landry's wife testified Landry had become "standoffish, quiet, [and] angry" before the argument with G.W.  But his state of mind *prior* to the alleged provocation is irrelevant to whether Landry reacted in a state of passion *in response* to the provocation.  As to that, O.J., observed that Landry was "upset" after G.W. slapped him.  But

15

Landry had the presence of mind after being slapped to turn away from G.W., open the back driver's side door of his vehicle, retrieve a firearm that he concealed from view, rack the gun to prepare to shoot, reach his arm around O.J., and aim a single fatal shot at G.W., avoiding the two other women who stood close enough that the shot made O.J.'s ears ring and splattered her skirt with blood. Landry did not release a wild flurry of untargeted shots in passion and anger. (Cf. *People v. Dominguez* (2021) 66 Cal.App.5th 163, 180 [the defendants' testimony they started shooting with their eyes closed in panic and fear, and evidence they collectively shot 21 bullets in 3.7 seconds– "significantly faster than would ordinarily be expected to aim and shoot"–was consistent with "a panic shooting"].)

The testimony that Landry was "upset" is scant evidence that he reached such violent or intense emotion that he reacted without thinking. He may have been angry, and may have acted imprudently, in deciding to shoot his friend. But "[o]ne does not act rashly . . . simply by acting imprudently or out of anger. Even imprudent conduct done while angry is ordinarily the product of some judgment and thought, however fleeting." (*Beltran, supra,* 56 Cal.4th at p. 950; see also *People v. Oropeza* (2007) 151 Cal.App.4th 73, 83

(*Oropeza*) [concluding it was insufficient that "an ordinarily reasonable person might be angered by the act"].)[2]

The court's directions to the jury as to the correct statement of the law on provocation, and its repeated admonition to follow the court's instructions and not the attorney's arguments, combined with the minimal evidence of the subjective component of heat of passion, compel us to conclude that Landry has not met his burden to show prejudice.

We affirm the conviction.

B. *Instruction on Imperfect Self-Defense*

Landry contends that the court should have instructed the jury on imperfect self-defense. The court did not err.

1. *Legal Principles*

A trial court has a sua sponte duty to instruct the jury on a lesser included uncharged offense only if there is substantial evidence that would absolve the defendant from guilt of the greater, but not the lesser, offense.

---

[2] That a slap to the face is intended as an insult has been long been recognized from the age of chivalric knights to modern televised award shows. But it is not an offense that historically has triggered such intense emotion that it *precludes* rational action; instead, the expected response to such an offense was so ritualized and intentional that it was coded in formal sets of rules. (See Allen & Reed, *The Duel of Honor: Screening For Unobservable Social Capital* (2006) American Law and Economics Review, vol. 8, no. 1, 2006, 81, 83, fn. 3 <http://www.jstor.org/stable/42705491> [as of Mar. 20, 2026] [tracing the history of the "duel of honor" from the 1500's through the middle of the twentieth century, noting such "[d]uels were fought over an insult, a slap to the face, a slur on reputation, 'coolness of manner,' or, most serious of all, an accusation of lying"]; Cochran, Noted American Duels and Hostile Encounters (1963) pp. 15-18 <https://openlibrary.org/books/OL5885389M/Noted_American_duels_and_hos tile_encounters> [as of Mar. 20, 2026] [the "Code Duello," adopted in 1777, contained 26 commandments covering all aspects of dueling].)

(*People v. Lopez* (1998) 19 Cal.4th 282, 288; *Barton, supra,* 12 Cal.4th at p. 201.) Minimal and insubstantial evidence is insufficient to require the instruction. (*Barton, supra,* 12 Cal.4th at p. 201.)

Under the doctrine of imperfect self-defense, when the trier of fact finds that a defendant killed another person because the defendant *actually,* but unreasonably believed he was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice and thus can be convicted of no crime greater than voluntary manslaughter. (*Manriquez, supra,* 37 Cal.4th at p. 581.)

### 2. *Analysis*

Landry did not testify and made no out-of-court comments indicating that when he shot G.W., he believed it was necessary to do so to defend his life or to avoid great bodily injury. It is true that evidence of a defendant's honest but unreasonable belief in in the need to defend against imminent peril to life may be found in the testimony of witnesses other than the defendant. (*People v. De Leon* (1992) 10 Cal.App.4th 815, 824.) However, no witness testified that Landry was afraid of G.W. Nor did any of the witnesses testify that they were afraid of G.W. themselves, which could have led Landry to the unreasonable belief that deadly force was necessary to protect them from G.W. No one ran to hide behind Landry, seeking protection from G.W. To the contrary, both O.J. and S.J. put themselves between the two men to prevent further escalation. O.J. testified that Landry appeared "upset," not fearful or scared. The primary evidence of Landry's state of mind was found in his conduct. He walked *away* from G.W., went to his car, retrieved his loaded gun, turned back to G.W., racked the gun, reached around O.J., pointed his gun at G.W., and pulled the trigger. Following the shooting, Landry got into his vehicle, backed out of the driveway, drove away

18

and got rid of the gun. This suggests that he fired the shot as an act of aggression, not fear. (See *Oropeza, supra,* 151 Cal.App.4th at p. 82.)

Because no substantial evidence suggested that Landry acted in imperfect self-defense, the court did not err in failing to sua sponte give an instruction on this lesser included offense. There was no violation of Fourteenth Amendment due process rights. (See *People v. Moon* (2005) 37 Cal.4th 1, 30 ["There being no error, we also reject defendant's claim that the alleged instructional error violated his due process rights under the United States Constitution."].)

C. *Sufficiency of Evidence of Second Degree Murder*

Landry contends that insufficient evidence supported his conviction for second degree murder, because the evidence only supported that Landry committed voluntary manslaughter in a heat of passion or in imperfect self-defense. We disagree.

1. *Legal Principles*

When a defendant challenges the sufficiency of the evidence supporting a conviction, "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 780.) We do not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts. (*People v. Helzer* (2024) 15 Cal.5th 622, 646.) Unless it is clear that "on no hypothesis whatever is there sufficient substantial evidence to support the verdict . . . ," we will not reverse. (*People v. Zaun* (2016) 245 Cal.App.4th 1171, 1174.) Given this deferential standard of review, a " 'defendant bears an enormous burden in

claiming there is insufficient evidence' to support a conviction." (*People v. Wear* (2020) 44 Cal.App.5th 1007, 1020.)

"Second degree murder is the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder." (See §§ 187, subd. (a), 189.) (*People v. Knoller* (2007) 41 Cal.4th 139, 151.) Malice may be either express or implied. (§ 188, subd. (a).) "Malice is express when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature." (*Id.*, subd. (a)(1).) "Malice is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (*Id.*, subd. (a)(2).)

2. *Analysis*

The record contains substantial evidence to support the jury's conclusion that Landry shot G.W. with express or implied malice. Landry drank so much that he reached the state of being "standoffish, quiet [and] angry" before the shooting. But he was a regular drinker, and the amount of alcohol he consumed did not appear to affect his ability to walk, speak, aim a gun, or drive. While he was not known to be violent, Landry had secretly acquired a loaded semi-automatic handgun and hidden it in his Durango. After his longtime friend G.W. slapped him and challenged him to fight, Landry hurled an insult back at G.W., walked to his vehicle, opened the back door, retrieved that loaded gun, and walked back to G.W. G.W. apparently recognized Landry's intent, taunting him to "Pull it out," "hit me," and "shoot me." Landry did so. Less than a minute after G.W. slapped him, Landry racked the semi-automatic and aimed one fatal shot into G.W.'s chest. He did not pause to help his wife and sister-in-law in their struggle to save G.W. He

got into the Durango, drove away, and disposed of the firearm.  On this evidence, a reasonable jury could reject provocation and heat of passion and convict Landry of second degree murder.

DISPOSITION

The judgment is affirmed.


O'ROURKE, Acting P. J.

WE CONCUR:


DATO, J.


DO, J.