Filed 2/10/16  P. v. Moreno CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ELIAS MORENO,<br><br>    Defendant and Appellant. | B258124<br><br>(Los Angeles County<br>Super. Ct. No. BA381307)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br>[NO CHANGE IN JUDGMENT] |

THE COURT:*

It is ordered that the opinion filed herein on January 27, 2016, be modified as follows:

1.  On page 7, the fourth sentence of the third full paragraph starting with "Novoa testified that" is deleted and the following sentence is inserted in its place:

> "Novoa also testified that he saw defendant free himself from Flores *before* Anguiano came out, and that Anguiano came out while defendant and Flores were struggling a second time."

2.  On page 8, the sentence in the paragraph at the top of the page starting with "Thus, at least nine minutes passed" is deleted and the following sentence is inserted in its place:

> "Thus, approximately nine minutes passed after defendant freed himself form Flores's grasp and after the head banging."

_____

*BOREN, P. J., ASHMANN-GERST, J., CHAVEZ, J.

3. On page 8, the sentence in the paragraph at the top of the page starting with "At most, the evidence suggests" is deleted and the following sentence is inserted in its place:

"At most, the evidence suggests that defendant might have thought his peril was imminent approximately nine minutes before he stabbed Flores."

4. On page 8, the final sentence of the paragraph at the top of the page starting with "It says nothing of his thinking" is deleted and the following sentence is inserted in its place:

"It says nothing of his thinking in those minutes after freeing himself from Flores's grasp."

There is no change in the judgment.

The petition for rehearing is denied.

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ELIAS MORENO,<br><br>    Defendant and Appellant. | B258124<br><br>(Los Angeles County<br>Super. Ct. No. BA381307) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Craig T. Mitchell, Judge.  Affirmed.

Carlo Andreani, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Eric J. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Elias Moreno (defendant) appeals from his attempted murder conviction. He contends that the trial court erred by failing to instruct the jury sua sponte on attempted voluntary manslaughter as a lesser included offense of attempted murder; and that the trial court's denial of his "*Faretta*"[1] motion resulted in a violation of his constitutional right to represent himself at trial. We find no merit to either of defendant's contentions. Furthermore, defendant has not demonstrated prejudice from the denial of his *Faretta* motion. We affirm the judgment.

## BACKGROUND

Defendant was charged in count 1 with the attempted murder of Jesus Flores (Flores) in violation of Penal Code sections 664 and 187, subdivision (a).[2] Count 2 alleged that defendant assaulted Flores with a deadly weapon, in violation of section 245, subdivision (a)(1), and count 3 alleged that the assault was committed by means likely to produce great bodily injury, in violation of section 245, subdivision (a)(1). The information also alleged that defendant personally inflicted great bodily injury on Flores, within the meaning of section 12022.7, subdivision (a), and as to counts 1 and 3, that defendant personally used a deadly and dangerous weapon, within the meaning of section 12022, subdivision (b)(1).

Count 3 was dismissed on motion of the prosecution. The trial court instructed the jury that since count 2 was alleged as a lesser included offense of count 1, a verdict should be returned on only one of the two counts. The jury found defendant guilty of count 1 as charged and found true the special allegations. On July 15, 2014, the court sentenced defendant to a total term of 11 years in prison, comprised of the middle term of seven years, plus a three-year enhancement due to the great bodily injury finding, and one year for use of a deadly weapon. Defendant was ordered to pay mandatory fines and fees, as well as victim restitution, and was given 463 days of presentence custody credit. Defendant filed a timely notice of appeal from the judgment.

---

[1]     See *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*).

[2]     All further statutory references are to the Penal Code, unless otherwise indicated.

2

**Prosecution evidence**

On February 1, 2011, defendant was having a barbeque with Aldo Amado Torres (Torres), Michael Novoa (Novoa), and another friend in the patio of the home of Juan Anguiano (Anguiano) and Maria Anguiano, Torres's parents. Defendant was drinking alcohol. The Anguiano property had several living units which Anguiano rented to several tenants. A fight broke out after Torres held his family's small dog over the hot barbeque grill, while Novoa and one of his other friends laughed. The sounds of yelling and the dog's cries caused Anguiano and Anguiano's friend Gabriel Rodriguez (Rodriguez), as well as two of the tenants, Jesus Flores (Flores) and Fabian Lopez (Lopez), to come to the patio. Flores testified that just before he reached the patio, he heard Rodriguez and Anguiano saying such things as "Let go of the animal," "Poor thing," and "Just let him go." Anguiano testified that he heard blows, but because he is blind, he did not know who was fighting. He tried to intervene, grabbed someone by the neck, but his friend Rodriguez said, "Hey it's me." Once Flores reached the patio, he saw defendant, Torres, Novoa, and the other friend all hitting Rodriguez. Flores intervened and tried to break up the fight, but defendant turned on him, explained that "they" had hit Torres, and asked Flores why he was "butting in."

Flores and defendant struggled. They grabbed each other by the shirt fronts, fell to the ground, stood up, and then separated. The fighting stopped for three to four minutes, and it seemed to Flores that the situation had calmed, when defendant approached and struck Flores's upper arm near his right shoulder, causing debilitating pain. Defendant then ran to Flores's side holding a knife in his hand. Looking furious, defendant extended his hands to his sides, moving his hands back and forth in a taunting or challenging manner, and said "Come on. Come on again. Come on." Flores then realized that the blow to his shoulder was a knife wound. Flores grabbed a patio chair to defend himself and threw it at defendant, hitting him; but defendant continued to advance. Defendant grabbed Flores, they fell to the ground, and Flores felt multiple stabbings, with the most intense pain near his lung. Flores suffered 13 knife wounds, and spent five days in the hospital with a draining tube in his lung.

Lopez testified that he came out of his unit in response to the sounds of fighting and arguing. He saw the two men fall, and then saw defendant on his knees on top of Flores. Although he initially thought that defendant was punching Flores, he soon realized that he was stabbing Flores over and over with a steak knife. As defendant was in mid-thrust, Lopez grabbed his wrist and told him to leave. Defendant stood, and after Lopez yelled at him to leave, defendant ran into the street. Lopez did not see Torres or Novoa during the altercation, but when Novoa appeared after defendant left, Lopez told him to leave as well. Anguiano called 911 as Lopez applied pressure to Flores's wounds.

Later that evening Los Angeles Police Officer Roberto Ruiz went to defendant's address, where he spoke to defendant's sister Blanca Moreno (Moreno). While the officer was there, Moreno received a telephone call from defendant. When Officer Ruiz asked to speak to him, Moreno handed over the phone. Defendant hung up. Moreno claimed that a few days before the February 1, 2011 incident, defendant had moved and no longer lived there.

A little more than two weeks later, when Officer Francisco Martinez went to Moreno's home, she said that defendant had come there soon after the incident. He appeared nervous, grabbed some of his clothes, and left in a car with two other men. She said that she found his car parked in Eagle Rock two days before Officer Martinez's visit, and drove it home. Moreno testified that she happened upon the car a few blocks from her daughter's school, that her boyfriend drove it to her home, and that she did not call law enforcement about it, although she knew that the police were looking for both the car and defendant.

Defendant was arrested more than two years later, when Los Angeles Police Officer Mario Ontiveros conducted a traffic stop of the car defendant was driving. When asked for his driver's license, defendant claimed that he did not have it with him, and gave his name as Damian Avalos.

**Defense evidence**

Novoa testified that he attended the barbeque at Torres's house that day with defendant and another friend, Chris. After a few beers, when Torres began to mistreat his

4

small poodle by holding him over the grill, Novoa stopped him. Novoa claimed that as he was stopping Torres, Rodriguez came from behind and "socked" Torres in the head, knocking him out, and then slammed Torres's head about five times on the front step of the house, causing Torres to bleed and his eyes to roll back. Novoa testified that defendant then "jumped in" and socked Rodriguez on the head, at which point Flores came from behind, hit defendant in the head, and "body slammed" defendant onto the ground. Flores grabbed defendant by the neck, began choking him, and banged his head on the ground. Novoa thought that defendant looked panicky, frightened, "like he was going to die or something."

Novoa testified that defendant managed to get away from Flores's grasp, but then Flores was on top of defendant again, and Novoa watched them struggle for about four minutes, until Anguiano and Maria Anguiano came out of the house and asked what was happening. Novoa stopped watching the fight to speak to them. He did not look back again until about five minutes later and did not see how the struggle ended. When Novoa did look back after hearing a noise, Flores was walking toward him and defendant was on the ground. Novoa thought that defendant was seriously hurt until he saw blood spurting from Flores's chest with every breath. He then saw defendant walking away as Lopez came out of the shed with his father, who had a machete in his hand. Maria Anguiano called the police. Novoa left the area when Torres told him to get out of there. Novoa claimed that Flores was still upright and conscious when he left. He knew that defendant used the name Damian Avalos.

**Rebuttal**

Defense investigator Michael DiMatteo testified that he interviewed Novoa at a McDonald's restaurant one day around noon. Describing Torres as a mean drunk, Novoa said that Torres was extremely intoxicated the day of the barbeque, when he tormented his dog by holding it over a hot grill and became involved in a fight with one of his guests. Novoa told Investigator DeMatteo that defendant intervened, although he never mentioned that defendant was choked or that his head was repeatedly banged against the concrete. Novoa did not say that Torres was "sucker-punched" or knocked out; and he

5

did not mention having a conversation with Torres's parents while Torres was unconscious. Novoa said that defendant and the person who had attacked Torres were fighting over a knife, and when he saw them both covered in blood, he thought that defendant had been stabbed, but learned later that it was someone else. Novoa did not tell him that anyone had brandished a machete that day.

## DISCUSSION

### I. Imperfect self-defense instruction

Defendant contends that the trial court erred by failing to instruct sua sponte on attempted voluntary manslaughter as a lesser included offense of attempted murder.

Attempted voluntary manslaughter is a lesser included offense of attempted murder. (See *People v. Van Ronk* (1985) 171 Cal.App.3d 818, 820, 824-825.) "If a person . . . attempts to kill in the unreasonable but good faith belief in having to act in self-defense, the belief negates what would otherwise be malice, and that person is guilty of . . . attempted voluntary manslaughter, not . . . attempted murder. [Citation.]" (*People v. McCoy* (2001) 25 Cal.4th 1111, 1116.) An honest belief means an actual belief that it is necessary to defend oneself from imminent peril to life or great bodily injury. (*In re Christian S.* (1994) 7 Cal.4th 768, 773.)

A trial court must instruct sua sponte on lesser included offenses that are supported by substantial evidence. (*People v. Licas* (2007) 41 Cal.4th 362, 366.) To determine whether substantial evidence supported the lesser included offense, we consider the evidence in the light most favorable to the defendant. (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137.) "However, the 'substantial' evidence required to trigger the duty to instruct on such lesser offenses is not merely '*any* evidence . . . no matter how weak' [citation], but rather '"evidence from which a jury composed of reasonable [persons] could . . . conclude[]"' that the lesser offense, but not the greater, was committed. [Citations.]" (*People v. Cruz* (2008) 44 Cal.4th 636, 664; see also *People v. Breverman* (1998) 19 Cal.4th 142, 154, 162.) "'We apply the independent or de novo standard of review to the failure by the trial court to instruct on an assertedly lesser included offense. [Citation.]'" (*People v. Licas*, at p. 366.)

6

In the absence of direct evidence, a defendant's state of mind may be inferred from the defendant's acts and the circumstances. (See *People v. Smith* (2005) 37 Cal.4th 733, 741.) When the defendant does not testify, substantial evidence of his belief in the need to defend against imminent peril may come from the testimony of witnesses to the effect that he appeared to be fearful at the moment he used deadly force. (*People v. Oropeza* (2007) 151 Cal.App.4th 73, 82.)

Defendant contends that substantial evidence of defendant's belief may be inferred from Novoa's testimony. Novoa claimed that after defendant hit Rodriguez while he was attacking Torres, Flores came from behind, hit defendant in the head, "body slammed" defendant onto the ground, choked him, and banged his head on the ground. Novoa thought that defendant looked panicky, frightened, "like he was going to die or something." As soon as defendant managed to get out of Flores's grasp, Flores, a "pretty big guy," was on top of him again, and Novoa watched them struggle for about four minutes. Defendant also points to evidence that Flores hit defendant with a chair thrown at him.

Defendant argues that the stabbing was a reaction to having his head banged on the cement. He contends that Novoa testified that the last he saw of the fight was Flores on top of defendant, choking him and repeatedly banging his head on the ground. In fact, however, Novoa testified that this was the last thing he saw before Anguiano came out of the house. Novoa testified that he saw defendant free himself from Flores *before* Anguiano came out, and that Anguiano came out while defendant and Flores were struggling a second time. Because Novoa stopped watching the fight to speak to the Anguianos and did not look back again until about five minutes later, he did not see how that struggle ended.

If defendant had stabbed Flores closer in time to the head banging, defendant's argument might have some merit. However, Novoa testified that after defendant freed himself from Flores's grasp, they struggled for about four minutes while Flores "*attempt*[*ed*] to do the same thing again." (Italics added.) Novoa did not observe the interaction between Flores and defendant over the next five minutes, and did not see the

7

stabbing or the end of the fight.  Thus, at least nine minutes passed after defendant freed himself from Flores's grasp and after the head banging.  To justify the instruction, the defendant's belief must have been that peril was *imminent*, meaning that "'"*from appearances, must be instantly dealt with.'. . .". . .* [Citation.]'" (*People v. Manriquez* (2005) 37 Cal.4th 547, 581.)  At most, the evidence suggests that defendant might have thought his peril was imminent some nine minutes before he stabbed Flores.  It says nothing of his thinking nine minutes after freeing himself from Flores's grasp.  (Cf. *People v. De Leon* (1992) 10 Cal.App.4th 815, 824.)

Defendant suggests that viewing the evidence in his favor requires drawing such inferences as the following:  that the choking and head banging continued during the four minutes that Flores attempted to "do the same thing again," as well as during the five minutes Novoa was not watching; that Novoa inaccurately estimated the time interval due to stress; and that the stabbing was thus a "prompt" reaction to the head banging. Defendant does not explain what evidence gives rise to such inferences.  An inference is a deduction drawn from facts that have been established by the evidence, not from an absence of evidence.  (See Evid. Code, § 600, subd. (b).)  What defendant describes is speculation.  (See *People v. Morris* (1988) 46 Cal.3d 1, 21, overruled on other grounds in *In re Sassounian* (1995) 9 Cal.4th 535, 543-545, fn. 6.)  And speculation "cannot rise to the dignity of an inference." (*People v. Massie* (2006) 142 Cal.App.4th 365, 374.)

The only substantial evidence of what occurred during the last five or so minutes came from Flores and Lopez.  Flores testified that the fighting had stopped for three to four minutes and all seemed calm when defendant approached and stabbed him in the shoulder.  Defendant then challenged Flores with the knife in his hand, saying, "Come on.  Come on again.  Come on." Flores then threw the patio chair to defend himself as defendant advanced.  It was at this moment that Lopez came outside and saw the two men fall.  Lopez testified that he saw defendant get on his knees on top of Flores and stab Flores multiple times.  No substantial evidence supports defendant's claim that his reaction was prompt, and the only substantial evidence of what did occur just before and during the stabbing cannot reasonably give rise to a inference that defendant stabbed

Flores while harboring an actual belief that he faced a peril so imminent that he had to act at that moment.

We conclude that the trial court was not required to give an instruction on imperfect self-defense. Regardless, any error in failing to do so would have been harmless. Defendant cites *People v. Thomas* (2013) 218 Cal.App.4th 630, 633-634, 646, as authority for the proposition that error in failing to instruct on voluntary manslaughter is properly reviewed under the more stringent standard for federal constitutional error, which requires reversal unless the reviewing court determines that the error was harmless beyond a reasonable doubt. (See *Chapman v. California* (1967) 386 U.S. 18, 24.) The California Supreme Court has instructed that the applicable standard is the test for state law error enunciated in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*), under which reversal is unwarranted unless an examination of all the evidence demonstrates a reasonable probability that the result would have been more favorable to the defendant had the error not occurred. (*People v. Breverman, supra*, 19 Cal.4th. at pp. 149, 177-178; accord, *People v. Blakeley* (2000) 23 Cal.4th 82, 93-94 [imperfect self-defense]; *People v. Randle* (2005) 35 Cal.4th 987, 1003 [imperfect defense of another], overruled on other grounds in *People v. Chun* (2009) 45 Cal.4th 1172, 1201.) Until a higher court rules otherwise, we follow the California Supreme Court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

In any event, we conclude that the court's failure to instruct on attempted voluntary manslaughter was harmless under either standard. The accounts given by Flores and Lopez about the final five minutes were uncontradicted and detailed. By contrast, Novoa did not see what happened, and his testimony about what he did see conflicted with the account he gave to the defense investigator. Until trial, Novoa never mentioned that Torres was knocked unconscious, that defendant was choked, or that defendant's head was banged against the concrete; and he did not mention having a conversation with the Anguianos for five minutes while their son lay before them unconscious and bleeding. Novoa told the investigator that he saw defendant and Flores fighting over a knife, and did not say that someone brandished a machete. Thus, the only

9

substantial evidence of the five minutes preceding the stabbing established that the fighting had stopped, the combatants had separated, and the situation appeared calm, when defendant advanced upon Flores with the knife.  The only reasonable inference to be drawn from the evidence is that defendant acted in anger and revenge, not from a belief that he was in imminent peril.  As defendant offers only speculation to the contrary, there is no reasonable probability that an instruction on imperfect self-defense would have changed the result.  We further find beyond a reasonable doubt that the absence of the instruction did not affect the trial's result.

## II. *Faretta* **motion**

Defendant contends that the trial court abused its discretion in denying his *Faretta* motion to represent himself.  The Sixth Amendment to the United States Constitution grants criminal defendants the right to counsel in all proceedings that may substantially affect their rights.  (*Mempa v. Rhay* (1967) 389 U.S. 128, 133-134; *Faretta, supra*, 422 U.S. at p. 807.)  The right to counsel may be waived if the waiver is knowing and intelligent.  (*Faretta*, at p. 807; *People v. Bradford* (1997) 15 Cal.4th 1229, 1363.)  So long as the defendant's request is made knowingly and voluntarily, and asserted within a reasonable time prior to trial, the right of self-representation is absolute.  (*People v. Doolin* (2009) 45 Cal.4th 390, 453.)  Otherwise, an untimely motion is left to the trial court's discretion.  (*People v. Windham* (1977) 19 Cal.3d 121, 127-129 (*Windham*).)

When defendant made his *Faretta* motion on May 22, 2014, the trial court found it untimely.  Defendant contends otherwise and that his right to represent himself was absolute and not a matter of the court's discretion.  There is no bright-line test of timeliness for *Faretta* motions.  (See *People v. Lynch* (2010) 50 Cal.4th 693, 771, overruled on other grounds in *People v. McKinnon* (2011) 52 Cal.4th 610, 636-643.)  However, *Faretta* motions made on the "eve of trial" are often found to be untimely. (*Lynch, supra*, at pp. 722-723, citing *People v. Valdez* (2004) 32 Cal.4th 73, 102 [motion made "moments before jury selection was set to begin"]; *People v. Horton* (1995) 11 Cal.4th 1068, 1110 [motion made on the date scheduled for trial]; *People v. Clark* (1992) 3 Cal.4th 41, 99-100 [case continued day-to-day with "jury selection set to begin at any

10

time"].)  "[T]imeliness for purposes of *Faretta* is based not on a fixed and arbitrary point in time, but upon consideration of the totality of the circumstances that exist in the case at the time the self-representation motion is made.  An analysis based on these considerations is in accord with the purpose of the timeliness requirement, which is 'to prevent the defendant from misusing the motion to unjustifiably delay trial or obstruct the orderly administration of justice.'  [Citation.]"  (*People v. Lynch, supra*, at p. 724, quoting *People v. Burton* (1989) 48 Cal.3d 843, 852.)

A consideration of the totality of the circumstances should include such factors as "the time between the motion and the scheduled trial date, . . .whether trial counsel is ready to proceed to trial, the number of witnesses and the reluctance or availability of crucial trial witnesses, the complexity of the case, any ongoing pretrial proceedings, and whether the defendant had earlier opportunities to assert his right of self-representation." (*Lynch, supra*, 50 Cal.4th at p. 726.)  It is apparent from the record that the trial court considered these factors.  The pretrial conference was held March 26, 2014, then continued to April 17, and thereafter trailed to April 21.  When trial was scheduled for April 29, 2014, the court indicated there would be no further continuances.  Prosecution witnesses appeared on the trial date, and the prosecutor was ready for trial, but agreed to a defense request to continue trial to May 22, 2014.  Contrary to defendant's claim that there had been no earlier opportunities to assert his right of self-representation, he appeared in court on each such date.  On May 22 (Thursday), the prosecution announced ready, and a substitute attorney appearing for defendant's trial counsel stated that the defense would be ready the following Tuesday, May 27, 2014.  It was then that defendant expressed an interest in representing himself.  In finding the *Faretta* motion untimely, the trial court observed that defendant first appeared in court in June 2013, nearly one year before, and had made "countless" appearances since then; and the court noted that it had previously indicated that there would be no more continuances.  The prosecutor expected to call 8 to 12 witnesses and estimated a six-day trial.  The defense expected to call two witnesses.  The court asked defendant whether he would be ready to proceed to trial the following Tuesday, as trial would not be continued, and defendant replied, "I don't think

11

so." The court "[took] that as a no," found the request to be a delaying tactic, and denied the motion.

As defendant would not be ready for trial, granting the motion would require a delay in the proceedings. This, in combination with the other factors discussed above, support the court's finding that the motion was untimely. The trial court must be afforded "'wide latitude in balancing the right to counsel of choice against the needs of fairness . . . , and against the demands of its calendar.'" (*Lynch, supra* 50 Cal.4th at p. 728.) Thus, the decision to grant the motion was not constitutionally mandated by the Sixth Amendment, but was a matter within the discretion of the trial court. (*Id*. at pp. 721-722; *Windham, supra*, 19 Cal.3d at pp. 124, 127-129.)

Defendant contends that in exercising its discretion, the trial court was required to hold a separate inquiry and express its reasoning on the record. The trial court was not required to state the reasons underlying its decision to deny a motion for self-representation; it was required only to establish a record sufficient to review its discretion. (*Windham, supra*, 19 Cal.3d at p. 129, fn. 6.) To establish such a record, the trial court should inquire into defendant's reasons for the request, the quality of counsel's representation, any prior proclivity of defendant to substitute counsel, the length and stage of the proceedings, and any disruption or delay which might reasonably be expected if the court granted the motion. (*Id*. at pp. 128-129.)

"[A] trial court's exercise of discretion in denying an untimely *Faretta* motion is properly affirmed if substantial evidence in the record supports the inference that the court had those factors in mind when it ruled. [Citation.]" (*People v. Bradford* (2010) 187 Cal.App.4th 1345, 1354.) We can infer from this record that the trial court considered some but not all the suggested *Windham* factors. Although the only inquiry made by the court was directed toward the timeliness of the motion, it is clear that during that inquiry, the court considered the length and stage of the proceedings, the delay which might reasonably be expected, and the absence of prior *Faretta* motions. The court made no inquiry of defendant's reasons or the adequacy of counsel's representation, and as defendant points out, defendant unsuccessfully attempted to address the court several

12

times. Although a trial court may deny an untimely motion for self-representation solely on the ground that a continuance would be required, the court must nevertheless inquire into defendant's reasons for the request and any claimed inadequacy of counsel. (*People v. Hernandez* (1985) 163 Cal.App.3d 645, 651, fn. 4, 653-655.) "[T]he court may not rely solely on its courtroom observations. [Citations.]" (*People v. Rivers* (1993) 20 Cal.App.4th 1040, 1049.)

As defendant's motion was untimely, the trial court's failure to make a proper inquiry did not present a constitutional issue, and does not warrant automatic reversal. (See *Windham, supra*, 19 Cal.3d at p. 129, fn 6.) Any error must be reviewed under the harmless error test of *Watson*. (*People v. Rivers, supra*, 20 Cal.App.4th at p. 1050.) Under that test, it is defendant's burden to establish "a reasonable probability that error affected the trial's result." (*People v. Hernandez* (2011) 51 Cal.4th 733, 746.)

Defendant has failed to meet his burden and instead simply argues that if this court does not agree that automatic reversal is warranted, the matter should be remanded for an evidentiary hearing. We reject any suggestion that defendant should be relieved of his burden because a review for harmless error may be difficult. Defendant's obligation requires a review of the whole record to demonstrate a reasonable probability that he would have achieved a more favorable result absent the error. (See *Watson, supra*, 46 Cal.2d at pp. 836-837; Cal. Const., art. VI, § 13.) Such a review, particularly where the *Windham* inquiry was inadequate, requires the evaluation of the error in light of the subsequent proceedings. (*People v. Rivers, supra*, 20 Cal.App.4th at p. 1051.)

Defendant has failed to refer to subsequent proceedings. The record does not show that defendant ever renewed his request, or that he complained about defense counsel or her strategy and tactics. He does not assert ineffective assistance of counsel or suggest what he might have done differently from trial counsel. Our review of the record reveals no indication that defendant might have achieved a better result had he represented himself. Indeed, "a defendant who represents himself virtually never improves his situation or achieves a better result than would trained counsel. [Citation.]" (*People v. Rivers, supra*, 20 Cal.App.4th at p. 1051; see also *Faretta, supra*, 422 U.S. at

13

p. 834 ["It is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts"].)  We conclude that the trial court's inadequate inquiry resulted in no harm.

## DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
                                                                CHAVEZ


We concur:



_____, P. J.
BOREN



_____, J.
ASHMANN-GERST