Filed 9/24/25  P. v. McMahon CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br>v.<br>SHAUN PATRICK McMAHON,<br><br>Defendant and Appellant. | A169821<br><br>(Humboldt County<br>Super. Ct. No. CR2101956) |

A jury found defendant Shaun Patrick McMahon guilty of first degree murder and found he personally and intentionally discharged a firearm in committing the murder.

On appeal, defendant contends the trial court erred, first, in admitting the preliminary hearing testimony of two witnesses after determining they were unavailable and, second, in refusing to instruct the jury on imperfect self-defense.  Defendant also argues the court abused its discretion in declining to strike the firearm enhancement.  We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

Defendant and Benjamin Scott Thomas were friends, but in the weeks before the killing, defendant said he was not friends with Thomas anymore and was going to kill him.  On the afternoon of June 23, 2021, defendant said if he saw Thomas, he was "gonna shoot" him.  Thomas then appeared, and

defendant shot him. Thomas died from blood loss caused by a gunshot wound to his left thigh.

The Humboldt County District Attorney charged defendant with murder (Pen. Code,[1] § 187) and alleged defendant personally and intentionally discharged a firearm in the commission of the murder, causing great bodily injury and death (§ 12022.53, subd. (d)).

A jury trial began in October 2023.

*The Prosecution's Case*

The prosecution's position was that defendant committed first degree murder under two theories: (1) lying in wait and (2) willful, deliberate, and premeditated murder. Evidence was presented of the following.

<u>Background</u>

Charles Garth owns a property in Trinidad, California, known as "Yee Haw" and a separate 320-acre property on Bald Hills Mountain Road (Bald Hills property) near Orick where marijuana is cultivated. In 2017 or early 2018, defendant, with his wife and her son, moved to the Yee Haw community.

At some point, defendant told Garth he was not getting along with his wife and asked to stay at the Bald Hills property, and Garth allowed defendant to stay in a cabin on the property.[2] Garth also permitted other people to stay at the Bald Hills property, generally in tents or trailers located within a few minutes' walk from the cabin.[3] About a week before the

---

[1] Undesignated statutory references are to the Penal Code.

[2] Further references to the "cabin" are to this structure, that is, the cabin on the Bald Hills property where defendant was staying in June 2021.

[3] It is not disputed that Emmanuel Moya, Andrea Vasquez, Abel Rodriguez, and Alejandra Sanchez were staying at the Bald Hills property in

2

shooting, Thomas told Garth "he wasn't gonna go up there [to the Bald Hills property] anymore" because he was having a conflict with defendant.

Heather Furchess met defendant and Thomas when she moved to Yee Haw. Defendant and Thomas both lived at Yee Haw at that time, and Furchess observed them daily for about a year. Defendant and Thomas were very good friends, but their relationship changed, and she had seen defendant being verbally aggressive with Thomas.[4] Furchess testified that about two or three weeks before the shooting, she heard defendant say that "he could not trust [Thomas] anymore," "[t]hat he was feeling betrayed," "[t]hat [Thomas] was not his friend anymore and that he was going to get back at him," and that "[h]e was going to kill him."

Emilia Bugarin-Faro also stayed on Garth's property. About a week before the shooting, she was talking with Thomas and Andrea Vasquez when defendant approached and pushed Thomas on the shoulder. Bugarin-Faro testified Thomas "didn't want confrontation [*sic*] with him" and "took off running." Then defendant "came with a rooster who had—like his head was kind of bleeding," and "threw the rooster right next to" Bugarin-Faro, and she was "somewhat frightened."[5]

---

June 2021. Vasquez described the Bald Hills property as "like a hippie community" and "really peaceful."

[4] Asked whether the verbal aggression between defendant and Thomas was "one-way or both ways between them," Furchess responded it was "one-way" with defendant as the aggressor.

[5] Vasquez testified she talked to defendant after he threw the rooster. She did not remember the conversation well but recalled that defendant was "mad." According to Vasquez, defendant and his wife had broken up, and Thomas gave defendant advice, "like, you know, 'You should just move on,' " but defendant "didn't like that," "[l]ike [Thomas] was giving the wrong advice for him."

The Shooting

On June 23, 2021, Bugarin-Faro was at the Bald Hills property near the cabin. She saw Thomas and Kevin Brown arrive at the property in Brown's vehicle and defendant sitting outside the cabin.

Bugarin-Faro saw defendant "rise up from his seat and grab the firearm" and say something to Thomas. Defendant pointed the firearm at Thomas, and Thomas said something to defendant. Bugarino-Faro did not speak English and did not understand, but what Thomas said "wasn't like a nice phrase." Thomas "raised his hands" and "went towards" defendant. Thomas had nothing in his hands and had no bag or backpack. Bugarin-Faro turned around and ran to get help from her friends, Emmanuel Moya and Andrea Vasquez, who were nearby.[6] Then she heard a gunshot.

Kevin Brown worked with Thomas on the Bald Hills property. (Brown described his work as "[d]igging holes" for growing marijuana.) Brown had seen Thomas working with defendant on the property in the past. Thomas and defendant appeared to be friends (they were "always like drinking and smoking, talking"), but Brown also observed that defendant was "always upset and saying Thomas is dictating to him, and Thomas is being like a sheriff, and he shoot sheriff [*sic*]." Brown never saw Thomas do anything aggressive toward defendant.

On the afternoon of June 23, 2021, Brown drove with Thomas from Trinidad to the Bald Hills property to do some work. The drive took about one-and-a-half to two hours. When they arrived, Thomas got out of Brown's

---

[6] Bugarin-Faro testified Moya and Vasquez were located about a minute to minute-and-a-half's walk from where she observed defendant, Thomas, and Brown.

truck and opened a gate.  Brown drove in and parked next to the cabin, which was not far from the gate,[7] while Thomas followed on foot.

Defendant was sitting outside the cabin.  He said to Brown, " 'Oh, if I see that fuckin' Thomas on the mountain, I have one bullet, and I'm gonna shoot that fucker.' "  Defendant said he was going to shoot Thomas " 'because he talks bad about me and talks bad about everybody.' "  Then Thomas appeared.  Defendant seemed "aggravated"; he pointed at Thomas and said, " 'Motherfucker, I'm gonna shoot you because you talk bad about me, and you talk bad about everybody.' "  Brown testified defendant "was trying to go back to the cabin like he was gonna go get something."  Brown " 'd[id]n't want to be part of this' " and started to unload soil from his truck.  He heard arguing, and Thomas said, " 'Go for it, bro, go for it.' "  Brown "heard the explosion" of a gunshot.  Defendant walked into the cabin "with the gun"; this was the first time Brown saw a firearm.  After the gunshot, Thomas, who was standing about 10 feet from the cabin, checked himself (he "lift[ed] his shirt up" and "pulled his pants down a little"), and Brown saw blood.  Thomas then ran inside the cabin.  Brown heard a commotion and went in the cabin.  He saw "Thomas on the ground with [defendant] over him trying to—like he wants to stab him with a knife in the chest."  Brown got the knife and "thr[e]w it away in the bush."

Brown testified, "Thomas said, 'You know what you just did?  You just killed your best friend.' "  Defendant "g[o]t up off Thomas and said, 'Oh, I'm not your fucking friend.  I'm not your fucking friend.' "

According to Brown, others who were staying at the Bald Hills property arrived at the cabin and helped move Thomas outside.  Defendant remained

---

[7] Brown thought it was around 40 feet from the gate to the cabin.

in the cabin, and Emmanuel Moya went inside the cabin and asked defendant why he did that. Brown, who was trying to help Thomas outside, did not hear a response from defendant.

Andrea Vasquez testified she was waking up from a nap when Bugarin-Faro came looking for her and yelling, " 'Shaun shot Thomas. Shaun shot Thomas.' " Vasquez and Moya ran to the cabin.[8] Vasquez saw Thomas lying down on the ground outside the cabin, "looking at the sky, pale," and she ran to him. Moya "went straight to [defendant]," and Vasquez thought Moya "tried to get the gun out of his hand." Moya "went to [defendant] like, 'What did you do? What did you do?' " Vasquez testified, "[Defendant] said, 'He made me do it.' Like nervous, you know, and probably shocked as well. I don't know." Defendant was outside the cabin when he said this, and he seemed "agitated."

Alejandra Sanchez testified she was working in a garden plot with Abel Rodriguez when she heard Bugarin-Faro scream. Sanchez and Rodriguez went toward the cabin. She saw "a puddle of blood . . . that was very, very big" at the side of the road near the cabin and another pool of blood on the step to the cabin.

Brown, Vasquez, and Sanchez took Thomas to a fire station in Orick.[9]

Bugarin-Faro stayed behind with Moya and Abel Rodriguez. She testified there were "knives and some different tools hanging" on the outside

---

[8] Vasquez testified she ran from her trailer to the cabin in three or four minutes.

[9] Brown testified they took him to the fire station because the nearest hospital was more than two hours away. A Cal Fire employee working at the fire station near Orick testified he "heard people shouting for help," and he and his partner attempted to render aid to Thomas, who was not breathing and never showed signs of life.

6

of the cabin, and they grabbed the knives to hide them "in case [defendant] came out of the house and came after us." Bugarin-Faro then saw defendant; he had changed his clothes and had a backpack. He smiled and "went off running."

That evening, Brown told Garth defendant killed Thomas, and Garth went to the cabin the next morning. He saw blood outside the cabin and a pool of blood on a rug inside the cabin. He also recovered a single-shot .410 shotgun from the cabin.

Investigation

A sheriff's investigator recovered the .410 single-shot break-action shotgun found in the cabin after the shooting. A brass casing for a .41 Remington Magnum that had split down the side was lodged inside the firearm. A criminalist who conducted DNA testing found "very strong support" for the conclusion that defendant contributed to the DNA mixture found on the trigger of the shotgun, but she did not find support for including defendant as a contributor to DNA found on the hammer of the shotgun.[10]

Senior criminalist Dale Cloutier examined the shotgun and determined it was functional, test-firing the shotgun with .410-gauge shotgun shells. Cloutier opined the .41 Magnum cartridge case found inside the shotgun was fired from the shotgun. He also explained that a .41 Magnum cartridge is smaller than the chamber and barrel of the .410 shotgun, and he did not test-fire the shotgun using a .41 Magnum cartridge because he felt it was unsafe as that ammunition "is designed for firearms that can handle much higher

---

[10] The criminalist could not opine on whether defendant touched the hammer; she testified that a person touching an item does not automatically mean the person's DNA will be found on the item.

7

pressures than a .410 bore shotgun. So there is potential for an explosive disassembly."

Forensic pathologist James Olson autopsied Thomas's body. Thomas had two perforating gunshot wounds: a nonfatal wound above the belly button that "did not produce any significant damage" and a lethal injury on the inside of the left thigh that "severed a major artery in the leg and would've typically caused profuse bleeding." Olson testified Thomas's thigh had "an atypical entrance wound" that was "quite irregular and atypical looking," suggesting "a bullet or part of a bullet that's already tumbling, is destabilized and striking the body." Presented the hypothetical that only one shot was fired from the .410 shotgun, Olson, who was familiar with firearms, opined that either the bullet fragmented or another object was in front of the bullet and was propelled by it.[11] He testified the projectile that hit Thomas's leg must "clearly have been deformed to produce this . . . very unusual atypical wound in the thigh." Toxicology tests for Thomas were negative.

*The Defense Case*

The defense position was that the prosecution witnesses' description of the shooting could not be believed, the physical evidence suggested two separate gunshots and, perhaps, the fatal gunshot to Thomas's leg was not even fired from the shotgun. Defense counsel also argued defendant acted in self-defense, suggesting the gunshot to Thomas's abdomen demonstrated the shooter was "firing to stop someone from coming at them," rather than

---

[11] Olson himself had not previously autopsied a body with two gunshot wounds from a single gunshot. From forensic pathology books and articles, however, he was aware of the possibility that "tandem projectiles" could cause more than one wound from one shot, and he had "seen photographs of victims of one gunshot with two or, in some cases, even more projectiles exiting."

8

shooting to kill, and all the evidence pointed to the shooting happening inside the cabin. Counsel argued that Thomas "lunged at" defendant, and defendant must have fired the lethal shot only after Thomas had entered his home in a threatening manner because "if [Thomas] was shot and he stumbled into the room, how much of a fight is he gonna put up? Is there really going to be a wrestling match over a knife with this man with this kind of injury?"

The defense presented evidence of the following.

Defendant turned himself in at the Humboldt County Sheriff's Office on July 7, 2021. He appeared to be about five feet, seven inches tall and around 150 pounds, and he had bruising on his arms and abrasions on his torso.

Devdas Chakravarti testified that in March 2020, Thomas severely beat him with a tire iron, and three days later, he went to the hospital and made a police report.[12] He described Thomas as at least six feet tall and "[t]hin-set."

---

[12] Chakravarti testified he was attacked on Quarry Road near Yee Haw, but he told the police he was attacked on Scenic Drive because he "didn't want the police to go up to the commune." His daughter testified that Chakravarti told her he was attacked in his sleep. Sheriff's Deputy Raleigh Willoughby, who responded to the hospital on Chakravarti's report of an assault, testified that Chakravarti told the deputy he was extremely intoxicated during the attack and was so drunk, he was unable to call 911 until the next day. Willoughby observed that Chakravarti had bruising around his face and lacerations on the top of his head, and the deputy opined Chakravarti's injuries could have been caused by an attack with a metal pipe or "[s]omeone could sustain injuries like that from falling down." No evidence was offered that Thomas was convicted or charged with a crime in connection with this incident.

9

Richard Pumerantz testified as an expert regarding firearms and ammunition. Based on his review of the forensic pathologist's testimony and autopsy report and assuming the shooter and victim were standing, he opined Thomas's abdominal injury was probably "from a hip-shot," fired "not much more than 10 feet" from the victim. Pumerantz concluded the size of the abdominal entry wound "matche[d] well to a .41 caliber projectile," but the entrance and exit wounds on Thomas's leg "are very different than what we would expect to see from a .41 caliber projectile." Assuming the shot was from the .410 shotgun, Pumerantz thought the leg injury could have been caused by a .410 slug and "could've been also fired from a greater distance." He thought the prosecution's theory that a .41 bullet fragmented and caused both the abdominal and leg injuries was "so unlikely." As to the possibility that there was another projectile in the barrel, he opined that would have created a bulge in the barrel of the shotgun, but the .410 shotgun found in the cabin had no barrel bulge. Pumerantz thought "a better theory" was that the two wounds were caused by two different firearms.[13]

Forensic specialist Andrew Campbell collected evidence in and around the cabin. DNA testing of a blood stain sample from the threshold of the cabin showed strong support for the conclusion Thomas was a contributor. DNA testing of a blood sample from a tablecloth inside the cabin showed very

---

[13] Presented with the hypothetical that the same shotgun was fired twice, Pumerantz opined that the *first* shot would have caused the (fatal) leg injury because the casing that was lodged in the chamber of the shotgun (which would have been left after the second shot) was consistent with the abdominal injury but not the leg injury. He further testified that, if the victim had been shot in the leg first, "it may have taken moments, minute [*sic*], some time before the shock would've gotten to the point that the pain would've set in," and it was conceivable the victim could still wrestle "with enough adrenaline."

strong support for the conclusion Thomas and defendant were contributors. Campbell also found blood stains on the front porch of the cabin and on the side of the road about 20 feet from the cabin and a golf club in the cabin just behind the door.

Emmanuel Moya testified he used to hang out at the Bald Hills property in a commune growing food and marijuana. On the day of the shooting, he was in his trailer when he heard a gunshot. He ran to the cabin and saw Thomas walk out of the cabin with his leg "shooting blood." He saw defendant coming out of the cabin and trying to reload the shotgun. Defendant appeared "mad." Moya testified, "I beat the shit out of [defendant] with a stick, trying to like, you know, take that gun out of his hand." He thought he beat defendant with a metal stick, and it could have been a golf club. Asked how defendant reacted when Moya was "striking [him] . . . with an object," Moya responded, "He was scared. He was nervous. He was like— I don't know what he was thinking in his mind, but I bet he was like 'What the heck I just did?' " Moya recalled defendant saying "he deserved it."

After taking Thomas to the fire station, Brown, Vasquez, and Sanchez returned to the Bald Hills property, and Brown talked about what happened immediately before the shooting. Moya denied that Brown said Thomas lunged at defendant. Asked whether he testified at the preliminary hearing something "to the effect of Thomas basically lunged himself at" defendant, Moya responded he could not remember "the exact word I used for it," but "probably I say that." Brown himself did not recall ever using the word "lunge" when telling Moya about the shooting. (Moya's first language is Spanish; he testified with an interpreter at the preliminary hearing and testified in English at trial.)

11

*Verdict and Sentence*

The jury found defendant guilty of first degree murder and found true the section 12022.53, subdivision (d), firearm enhancement for intentional discharge causing death. The trial court sentenced him to 50 years to life in prison, consisting of 25 years to life for first degree murder and 25 years to life for the firearm special allegation.

## DISCUSSION

A.  *Admission of Preliminary Hearing Testimony of Witnesses*

At the time of trial, Andrea Vasquez and Alejandra Sanchez were living in Spain. The trial court found them unavailable as witnesses and allowed their complete preliminary hearing testimony from March 2022 to be read to the jury.[14] Defendant contends this was error.

1.  Procedural Background

At a hearing on the parties' motions in limine, the trial court noted the prosecutor had requested certain witnesses—Andrea Vasquez and Alejandra Sanchez—to appear by Zoom if the defense had no objection. The prosecutor then stated that, if the defense would not stipulate to witnesses testifying via video, the prosecution would move in limine to have the transcripts of the witnesses' preliminary hearing testimony read into the record for the jury. Without a defense stipulation, the prosecutor explained, "we need to set a [hearing under Evidence Code section] 402 for Investigator Morris to establish diligence so the Court can decide whether or not to allow the preliminary hearing transcript to be used."

Defense counsel objected to any witnesses being introduced by Zoom, and the court held a hearing under Evidence Code section 402 to determine

---

[14] This included cross-examination by the same defense counsel who represented defendant at trial.

12

whether witnesses Vasquez and Sanchez were unavailable such that their preliminary hearing testimony could be admitted at trial.

Martin Morris, an investigator with the district attorney's office, testified at the hearing. The case had been set for trial more than once, and each time, he was tasked with attempting to serve subpoenas on witnesses associated with the case. Morris first attempted to make contact with Vasquez and Sanchez in January 2023 "us[ing] the regular techniques that we would typically use to track somebody down." At the preliminary hearing in March 2022, Morris had learned that Vasquez and Sanchez were not U.S. citizens, and they both "expressed a desire to return home" to Spain. Accordingly, he "reached out to the embassy in Spain" and the U.S. State Department, but "nobody was able to determine . . . where these individuals were located." Morris believed Heather Furchess had some continuing communication with the witnesses, and he asked Furchess to give them his contact information and to ask them to reach out to him.

Morris "continued periodically through 2023 up until mid October" to attempt to contact Vasquez and Sanchez. Eventually, he received a voicemail from Vasquez and exchanged emails with her around the first week of October.[15] In mid-October, Morris learned from Vasquez that she was in Spain and "outside the jurisdiction of my ability to subpoena her." Morris similarly exchanged emails with Sanchez and learned she was "in Spain and unable to attend the hearing." It was not clear to him when the witnesses returned to Spain, but by January 2023, he "was already receiving information from . . . Furchess that they had left the country."

---

[15] The trial began on the fourth week of October. Morris was testifying on October 27, 2023.

The prosecutor argued Morris's testimony demonstrated reasonable diligence in attempting to locate the witnesses. He argued Vasquez and Sanchez "are outside the country and outside the jurisdiction of any subpoenas here in . . . the State of California," so their preliminary hearing testimony was admissible given that defendant at the prior hearing "had the opportunity to confront and cross-examine them at the point where his interests were aligned with the interests of cross-examination at trial."

Defense counsel argued that Morris's testimony did not show "diligence to procure [the witnesses'] attendance through the court's process." He asserted the "DA's office has an enormous amount of ability, including working through interstate and international jurisdictions," and "there's likely treaties and abilities to work with embassies in those countries to bring them to fruition just as we do with the extradition process."

The prosecutor responded the salient fact was that Morris "just located them roughly two and a half, three weeks ago." He stated, "[I]n that short time, we were unable to compel their attendance using the court process in terms of getting a subpoena. We would not be able to, on that short time frame, get a subpoena that would be issued here, go through the treaty process with a foreign nation, get a subpoena issued by the foreign government that would authorize them to come here and testify, get appropriate visas through the State Department and allow them to come from Spain to the United States of America in order to testify on such short notice." Defense counsel countered that the district attorney's office "could've made better efforts to stay in touch with the witnesses since January of 2023."

The trial court found Vasquez and Sanchez were "unavailable as that phrase is used in Evidence Code [section] 240[, subdivision] (a)," and allowed the two witnesses' prior sworn testimony to be presented to the jury at trial.

### 2. Applicable Law and Standard of Review

"A criminal defendant has the right, guaranteed by the confrontation clauses of both the federal and state Constitutions, to confront the prosecution's witnesses," but the "right of confrontation is not absolute." (*People v. Herrera* (2010) 49 Cal.4th 613, 620–621 (*Herrera*).) There is " ' "an exception to the confrontation requirement where a witness is unavailable and has given testimony at previous judicial proceedings against the same defendant [and] which was subject to cross-examination. . . ." [Citation.]' [Citation.] Pursuant to this exception, the preliminary hearing testimony of an unavailable witness may be admitted at trial without violating a defendant's confrontation right." (*Id*. at p. 621.) This exception is codified in the Evidence Code. (*Ibid*.; Evid. Code, § 1291, subd. (a)(2).)

Under Evidence Code section 240, subdivision (a), a declarant is " 'unavailable as a witness' " if "the court is unable to compel his or her attendance by its process" (§ 240, subd. (a)(4)) or "the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process" (*id*., subd. (a)(5)).

The term "reasonable diligence" as used in Evidence Code section 240, subdivision (a)(5), " ' " 'connotes persevering application, untiring efforts in good earnest, efforts of a substantial character.' " ' [Citation.] Considerations relevant to the due diligence inquiry 'include the timeliness of the search, the importance of the proffered testimony, and whether leads of the witness's possible location were competently explored.' " (*Herrera, supra*, 49 Cal.4th at p. 622.)

15

"[W]hen a criminal trial is at issue, unavailability in the constitutional sense does not invariably turn on the inability of the state court to compel the out-of-state witness's attendance through its own process, but also takes into consideration the existence of agreements or established procedures for securing a witness's presence that depend on the voluntary assistance of another government.  [Citation.]  Where such options exist, the extent to which the prosecution had the opportunity to utilize them and endeavored to do so is relevant in determining whether the obligations to act in good faith and with due diligence have been met." (*Herrera*, *supra*, 49 Cal.4th at p. 628.)  "[T]he lengths to which the prosecution must go to produce a witness in a given set of circumstances is a question of reasonableness." (*Id*., at p. 628, fn. 10.)

In reviewing a trial court's determination that a prosecution witness was unavailable, we review the court's findings of facts for substantial evidence and independently review whether the facts demonstrate diligence. (*Herrera*, *supra*, 49 Cal.4th at p. 623.)

3.    Analysis

Defendant contends the prosecution failed to exercise reasonable diligence.  We disagree.

Considering the timeliness of the search, the importance of the proffered testimony, and whether leads of the witnesses' possible locations were competently explored (*Herrera*, *supra*, 49 Cal.4th at p. 622), we conclude the prosecution's efforts were reasonable.  Morris began searching for the witnesses in January 2023.  His search efforts, initiated many months before the trial, were timely.  The witnesses' testimony was not critically important to the prosecution's case; neither witness was present when the shooting occurred, and their testimony was generally cumulative of the testimony of

16

Brown, Bugarin-Faro, and Moya, all of whom testified at trial. (See *People v. Fuiava* (2012) 53 Cal.4th 622, 676 ["the reasonableness of the activities is supported by the circumstance that [the witness's] testimony was not of critical importance in the trial"].) Finally, over the course of months, Morris used "regular techniques" to track the witnesses down, he contacted the State Department and embassy in Spain for help locating them, and he tried to communicate with them through their known associate, Furchess. We believe these were reasonable steps under the circumstances.

Defendant suggests Morris could have done more to ascertain the possible future locations where Vasquez and Sanchez might move to in Spain when he was in contact with them in March 2022 and he could have used international law to secure their attendance. However, "the circumstance that 'additional efforts might have been made or other lines of inquiry pursued does not affect [our] conclusion. [Citation.] It is enough that the People used reasonable efforts to locate the witness[es].' " (*People v. Fuiava*, *supra*, 53 Cal.4th at p. 677; see *Hardy v. Cross* (2011) 565 U.S. 65, 71 ["when a witness disappears before trial, it is always possible to think of additional steps that the prosecution might have taken to secure the witness' presence, [citation], but the Sixth Amendment does not require the prosecution to exhaust every avenue of inquiry"].) Because the prosecution showed reasonable diligence, Vasquez and Sanchez were unavailable as witnesses, and the trial court properly allowed the prosecution to present their preliminary hearing testimony at trial. (See *Fuiava*, *supra*, 53 Cal.4th at p. 677 [where "the prosecution exercised reasonable diligence under the circumstances in attempting to locate [the witness]," "the presentation at trial of [the witness]'s preliminary hearing testimony did not violate

defendant's statutory and constitutional rights"]; Evid. Code, §§ 240, subd. (a)(5); 1291, subd. (a)(1).)

B.    *Failure to Instruct on Imperfect Self-Defense*

Defendant next claims the trial court violated his right to due process in refusing to deliver an imperfect self-defense instruction.

1.    Background

The defense requested the court give the jury CALCRIM No. 571, voluntary manslaughter: imperfect self-defense. The prosecutor objected, arguing there was no evidence showing defendant actually believed either that he was in danger or that he had to use deadly force. He stated, "[T]he only way we could get that evidence is if he testified."

Defense counsel responded that defendant's testimony was not required for the jury to infer his actual beliefs. He argued, "[T]he standard, you know, is a reasonable person standard. And reasonable people understand context and circumstances. So whether a reasonable person actually believed that can be inferred without hearing directly from my client." He continued, "It could be imperfect, you know, given an unreasonable—given an unreasonable belief of my client. But I think there is enough there for them to find that one of those beliefs were reasonable, you know, given the circumstances on your doorstep with a one-shot firearm being approached by someone who's challenging you where you have knives behind you."

The court declined to give CALCRIM No. 571 concluding, "there is no substantial evidence as to the defendant's actual belief."

The jury was instructed on justifiable homicide: self defense or defense of another (CALCRIM No. 505); justifiable homicide: defending against harm to a person within home or on property (CALCRIM No. 506); provocation: effect on degree of murder (CALCRIM No. 522), voluntary manslaughter:

18

heat of passion—lesser included offense (CALCRIM No. 570); and involuntary manslaughter: lesser included offense (CALCRIM No. 580).[16]

### 2. Applicable Law and Standard of Review

" 'Under the doctrine of imperfect self-defense, when the trier of fact finds that a defendant killed another person because the defendant *actually*, but unreasonably, believed he was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice and thus can be convicted of no crime greater than voluntary manslaughter.' [Citation.] '[J]ust as with perfect self-defense or any defense, "[a] trial court need give a requested instruction concerning a defense *only if there is substantial evidence to support the defense.*" ' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1048–1049.)

"Where . . . the defendant's version of events, if believed, establish[es] actual self-defense, while the prosecution's version, if believed, negates both actual and imperfect self-defense, the court is not required to give the instruction" on imperfect self-defense. (*People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 834, disapproved of on another point by *People v. Dalton* (2019) 7 Cal.5th 166, 214.) Moreover, "just because the court permit[s] instructions on perfect self-defense does not mean that substantial evidence support[s] the giving of an imperfect self-defense instruction." (*People v. Rodriguez* (1997) 53 Cal.App.4th 1250, 1270.)

"We review de novo a trial court's decision not to give an imperfect self-defense instruction." (*People v. Simon* (2016) 1 Cal.5th 98, 133 (*Simon*).)

---

[16] The jury was also instructed on first or second degree murder with malice aforethought (CALCRIM No. 520); first degree murder under theories of (1) willfulness, deliberation, and premeditation and (2) lying in wait (CALCRIM No. 521); and right to self defense: mutual combat or initial aggressor (CALCRIM No. 3471).

3.    Analysis

Defendant argues on appeal that there was sufficient evidence to warrant an instruction on imperfect self-defense.  He claims the evidence showed the following: Thomas and defendant "had been fighting for several weeks before the shooting"; "although Thomas told Garth he would avoid [defendant] in the future, he arrived at [the] cabin unannounced"; Thomas "approached [defendant] with his arms outstretched and . . . there were a number of knives alongside the cabin"; Thomas "said something threatening" to defendant, and "lunged at [defendant] before being shot"; both defendant's and Thomas's "blood had been found on the threshold and inside [the] cabin and Moya testified he believed the two had been using alcohol and drugs before the shooting"; and, after the shooting, defendant said, "He made me do it."

We disagree with defendant's characterization of the record and find no substantial evidence to support an imperfect self-defense instruction.  The evidence of "fighting" between Thomas and defendant was that it was entirely one-sided, with all the aggression shown by defendant directed at Thomas.  There was no evidence that Thomas went to the Bald Hills property to antagonize defendant or to engage with him at all.  Rather, the evidence was that Thomas went with Brown to the property to work, an activity he had done before, and the cabin happened to be very close to the entrance to the property.[17]  There was no evidence that Thomas initiated a confrontation with defendant.  Bugarin-Faro testified that defendant pointed the weapon at

_____

[17] Brown testified the cabin was around 40 feet from the gate.  Forensic Specialist Campbell described the Bald Hills property as having a driveway that splits into a Y with the cabin at the center of the Y.  It was Brown who chose to park near the cabin, and then he began unloading soil, suggesting he parked there because it was a convenient spot from which to begin his work.

20

Thomas first, and then Thomas "raised his hands" and "was going towards [defendant] with his hands up in the air."[18]  There was no evidence that Thomas lunged at defendant before he was shot (and indeed, Brown, the only person present at the shooting, denied ever saying that Thomas lunged at defendant at any point before or after being shot).  Nor was there any evidence that Thomas had been using alcohol and drugs before the shooting.[19]

In *Simon*, *supra*, 1 Cal.5th at page 133, the evidence suggested that the defendant, Simon, not the victim, "was the aggressor in their confrontation.  It was Simon who began cursing at [the victim]," while the victim "lift[ed] up his shirt to prove that he was unarmed."  Simon and the victim subsequently

---

[18] Brown testified he heard arguing, and Thomas said, " 'Go for it, bro, go for it.' "  But there was no evidence Thomas physically threatened defendant or that he had a weapon.  Bugarin-Faro testified Thomas had nothing in his hands when he approached defendant.  This is not evidence from which it reasonably could be inferred that defendant actually feared he was in imminent danger of death or great bodily injury.  (See *People v. Landry* (2016) 2 Cal.5th 52, 98 [evidence the defendant and the victim were " 'having words' just before the fatal attack" and the defendant had previously written that "the victim had decided to 'disrespect me, and threaten harm to me' " did "not begin to demonstrate . . . imminence of danger of death for purposes of imperfect self-defense voluntary manslaughter"; hence, no jury instruction on imperfect self-defense was required].)

[19] After describing that he beat defendant with a stick, Moya testified, "I don't know if he'll remember, but he was really drunk and high.  I don't even know."  Asked who he was referring to, Moya responded, "Shaun.  Or both of them.  I don't even know.  I don't do drugs, you know.  I just—I can tell.  Like drinking every day and all that, that's not like good behavior."  Asked how he knew they were doing drugs, he responded, "Because you can see it every day when you walk by, like a bunch of cans and bottle[s] of rum, things like that."  Moya arrived at the scene only after Thomas had been shot, and his testimony is not competent evidence that Thomas had been drinking or taking drugs immediately before the shooting.  The toxicology report for Thomas was negative.

"began to argue" and Simon shot the victim. (*Ibid*.) Simon's request for a jury instruction on imperfect self-defense was denied, and our high court found no error. (*Id*. at pp. 132–134.) The court concluded the record was "devoid of evidence tending to show Simon's subjective fear of [the victim]. Simon . . . initiated any aggressive interactions . . . [and] the record indicates that [the victim] was unarmed. Simon also did not testify, and there is no evidence he ever told anyone that he had acted out of fear." (*Id*. at p. 134.)

Likewise, in the present case, all the evidence suggests that defendant was the aggressor, threatening to shoot Thomas and pointing a shotgun at him, and that Thomas was unarmed. Also, there was no evidence defendant ever said he acted out of fear.[20]

It is true that "[s]ubstantial evidence of a defendant's state of mind, including an 'honest but unreasonable belief in the necessity to defend against imminent peril to life' [citation], may be present *without* defendant

---

[20] To the contrary, the evidence all pointed to defendant harboring a simmering resentment toward Thomas unrelated to fear for his own physical safety. Defendant told Brown he would shoot Thomas if he saw him because Thomas " 'talks bad about me and talks bad about everybody' " before Thomas even appeared on the day of the shooting (and therefore, before Thomas could have done anything that could have resulted in defendant subjectively believing that Thomas was about to kill, or inflict great bodily injury upon, him). Moya testified that defendant said Thomas "deserved it" after the shooting. Furchess testified that defendant said he was going to kill Thomas about two or three weeks before the shooting. At that time, defendant said he felt betrayed by Thomas, not that he was afraid of him. On this record, evidence that defendant also said, "He made me do it," after shooting Thomas does not provide substantial evidence he subjectively feared imminent harm from Thomas.

Defendant also claims the evidence suggests Thomas was shot inside the cabin, asserting the "majority" of his blood was found inside the cabin, but we see nothing in the record to support his assertion that more blood was found inside the cabin than outside.

testimony." (*People v. De Leon* (1992) 10 Cal.App.4th 815, 824.) But our conclusion is not based on defendant's decision not to testify. Rather, we have examined the record and found it devoid of evidence suggesting defendant actually believed he was in imminent danger of death or great bodily injury at Thomas's hands. (See *People v. Manriquez* (2005) 37 Cal.4th 547, 581 [finding the record "devoid of evidence suggesting that when defendant . . . confront[ed the victim], he harbored an actual belief in the need for self-defense against an imminent danger to life or great bodily injury"].)

In sum, we conclude no substantial evidence warranted a jury instruction on imperfect self-defense in this case. Consequently, we further conclude the trial court properly declined defendant's request that such an instruction be given and defendant's due process claim based on asserted instructional error fails. (See *Simon*, *supra*, 1 Cal.5th at p. 134 ["the trial court did not err in refusing Simon's request to instruct on imperfect self-defense" where "there was not substantial evidence supporting Simon's actual belief that he was in imminent danger of great bodily injury or death"]; *People v. Manriquez*, *supra*, 37 Cal.4th at p. 582; *People v. Crew* (2003) 31 Cal.4th 822, 835 [where no substantial evidence supported a jury instruction, not giving the instruction did not violate the defendant's due process rights].)

C.    *Sentencing*

    1.    <u>Background</u>

In anticipation of sentencing, the probation officer prepared a presentence report recommending a sentence of 25 years to life for the murder count and a consecutive term of 25 years to life for the firearm enhancement under section 12022.53, subdivision (d).

23

The report documented the current offense and defendant's statement about the offense. Defendant admitted that he had been drinking heavily in the weeks before the shooting. Defendant stated he and Thomas argued after he confronted Thomas about lies Thomas had been spreading about defendant around Yee Haw. According to the report, defendant "related that during their argument . . ., he found the firearm in his hands" and "he did not remember much of what happened after that, other than he had been pointing the firearm at a downward angle and thought Mr. Thomas may have been hit with a ricochet." "Defendant commented that if he had wanted to shoot Mr. Thomas, he certainly would not have shot him in the leg." Defendant expressed regret about what happened, stating, " 'I know it won't bring him back, but I wish I could take back everything.' "

Defendant reported having been diagnosed as a teen with anxiety disorder, depression disorder, and post-traumatic stress disorder (PTSD), stemming from childhood trauma and time spent in juvenile facilities. He reported that he had been hospitalized for suicidal ideation four times and that he was currently prescribed Seroquel, Gabapentin, Zoloft, and Suboxone. He said he had run out of medication about two weeks before the shooting. He reported that his drugs of choice were methamphetamine, morphine, and Percocet.

The presentence report documented defendant's criminal history, which included felony convictions in Alaska for burglary in 1995, 1997, 2004 and attempted burglary in 2011 and a misdemeanor conviction in Washington for display of a weapon with intent to intimidate.

Defendant filed a statement in mitigation. He argued the firearm enhancement should be dismissed under section 1385, subdivision (c) (section 1385(c)) because his current offense was connected to mental illness. He

24

asserted his "mental illness played a role in this offense, causing him to exaggerate physical threats to his safety and react more quickly in a fight or flight mode."

Defendant also identified the following circumstances in mitigation, citing California Rules of Court, rule 4.423 only: (1) he had an insignificant record of criminal conduct, with no convictions of crimes involving violence against others; (2) he "was suffering from a mental or physical condition that significantly reduced culpability for the crime"; (3) the commission of the offense was connected to "prior victimization or childhood trauma, or mental illness as defined by section 1385(c)"; (4) defendant "voluntarily acknowledged wrongdoing before arrest or at an early stage of the criminal process"; and "[a]pplication of an enhancement could result in a sentence over 20 years."

At the sentencing hearing, defense counsel argued the murder was the result of "irrational delusion or paranoia." He said, "[T]he motive isn't understandable without appreciating [defendant] having some mental health issues. PTSD with history of substance abuse issues that witnesses testified to." Defense counsel suggested "substances and lack of mental health medications were at play" for defendant at the time of the shooting. And he argued it was "possibly" cruel and unusual punishment to impose a sentence that is effectively life without the possibility of parole for defendant, who was 51 years old at the time of sentencing.

The prosecutor urged the court to follow the probation officer's recommendation. He also noted that, under the elderly parole system, defendant "would be eligible for early parole at a certain age. So it is not

necessarily that he would be 100 years old before he got his first parole hearing."[21]

The court declined to dismiss the firearm enhancement. The court stated, "[I]n light of the nature of the crime, I think the events leading up to the crime, as well as the—there was testimony that after shooting the gun [defendant] attempted to reload the gun and then it was taken away before he could do so. But that was consistent also with the testimony of the condition in which the gun was found. That it was found with a bullet jammed into the rifle which would support the testimony that [defendant] was trying to reload to shoot again."

### 2.    Applicable Law and Standard of Review

Under section 1385(c)(1), the trial "court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute." In exercising its discretion under section 1385, "the court shall consider and afford great weight to evidence offered by the defendant to prove . . . [specified] mitigating circumstances . . . are present. Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety. 'Endanger public safety' means there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others." (§ 1385(c)(2).)

---

[21] Under the Elderly Parole Program, "any inmate who is 50 years of age or older and has served a minimum of 20 years of continuous incarceration on the inmate's current sentence" is eligible for parole. (§ 3055, subd. (a).)

26

As relevant to this appeal, the list of mitigating circumstances in section 1385(c)(2) includes:

"(C) The application of an enhancement could result in a sentence of over 20 years.  In this instance, the enhancement shall be dismissed."

"(D) The current offense is connected to mental illness." (§ 1385(c)(2)(C)–(D).

If the defendant proves a mitigating circumstance is present and "the court does not find that dismissal would endanger public safety, the presence of an enumerated mitigating circumstance will generally result in the dismissal of an enhancement unless the sentencing court finds substantial, credible evidence of countervailing factors that 'may nonetheless neutralize even the great weight of the mitigating circumstance, such that dismissal of the enhancement is not in furtherance of justice.' " (*People v. Walker* (2024) 16 Cal.5th 1024, 1029.)

In general, we review a trial court's decision whether to dismiss an enhancement pursuant to section 1385 for abuse of discretion.  (*People v. Ortiz* (2023) 87 Cal.App.5th 1087, 1093 (*Ortiz*); *People v. Gonzalez* (2024) 103 Cal.App.5th 215, 225.)[22]  "[A]n abuse of discretion occurs where the trial court was not 'aware of its discretion' to dismiss [citation], or where the court considered impermissible factors in declining to dismiss." (*People v. Carmony* (2004) 33 Cal.4th 367, 378.)

---

[22] But see *Ortiz*, *supra*, 87 Cal.App.5th at page 1095, footnote 5 (observing that, if the trial court's determination that the defendant failed to show his current offense was connected to mental illness "is best understood as a *factual finding* subject to review for *substantial evidence*, the question before us would be whether the evidence compels a finding in favor of [the defendant] as a matter of law," and concluding "the gaps in the evidentiary showing preclude a determination that the evidence compelled a finding in [the defendant]'s favor" (italics added)).

" 'To prove an abuse of discretion, " '[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary.  [Citation.]  In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review.' "  [Citation.]  To meet this burden, the defendant must "affirmatively demonstrate that the trial court misunderstood its sentencing discretion." ' "  (*People v. Fredrickson* (2023) 90 Cal.App.5th 984, 988.)

    3.    <u>Analysis</u>

Defendant argues the trial court abused its discretion in declining to dismiss the firearm enhancement.  He claims two mitigating factors "indisputably" applied: first, the application of the enhancement could result in a sentence of over 20 years (§ 1385(c)(2)(C) and, second, the murder was connected to mental illness (§ 1385(c)(2)(D)).  He argues the trial court abused its discretion in declining to dismiss the enhancement because the court failed to expressly find either that the dismissal would result in a danger to public safety or that countervailing factors neutralize the great weight of the mitigating circumstances, citing *People v. Walker*, *supra*, 16 Cal.5th 1024.[23]

The Attorney General responds that defendant has forfeited his claims of sentencing error because he did not object when the trial court stated its

---

[23] We note that "no particular language was required for the trial court to decline to dismiss" the firearm enhancement in this case; "[s]ection 1385, subdivision (a), requires a trial court to state its 'reasons for the dismissal . . . orally on the record,' but there is no similar statutory requirement when a court denies a request to dismiss an enhancement."  (*People v. Bravo* (2025) 107 Cal.App.5th 1144, 1157.)

sentencing decision. We conclude defendant has preserved an appellate claim regarding the trial court's application of section 1385(c)(2)(D) (the offense is connected to mental illness) by arguing the point with the trial court, but he has forfeited his claim regarding section 1385(c)(2)(C) (application of the enhancement could result in a sentence of over 20 years) because he never raised that statutory provision with the trial court either in his statement in mitigation or at the sentencing hearing. (*People v. Scott* (1994) 9 Cal.4th 331, 356 ["complaints about the manner in which the trial court exercises its sentencing discretion and articulates its supporting reasons cannot be raised for the first time on appeal"].)

Considering defendant's claim regarding section 1385(c)(2)(D), we see no abuse of discretion. To the extent defendant's argument is that the trial court was required *as a matter of law* to dismiss the firearm enhancement under section 1385(c)(2)(D) on this record, we reject such a claim. A reasonable sentencing court, for example, could have found that defendant failed to prove the murder was connected to mental illness in the first place. (See *Ortiz*, *supra*, 87 Cal.App.5th at p. 1095 [where the defendant did not provide any records or reports of qualified medical experts regarding his mental illness and there was no evidence linking his mental illness to the commission of the offense, the trial court was not required to find section 1385(c)(2)(D) applied].) To the extent defendant's argument is that the trial court applied an incorrect standard in exercising its discretion under section 1385, he has failed to show the trial court misunderstood the law. (See *People v. Reyes* (2016) 246 Cal.App.4th 62, 82 [a sentencing "court is 'presumed to have been aware of and followed the applicable law' " and the burden is on the appellant to demonstrate the court misunderstood its sentencing discretion].)

29

As to any appellate claim he has forfeited, defendant argues his defense counsel's failure to object to the trial court's sentencing decision amounted to ineffective assistance. To demonstrate ineffective assistance of counsel, defendant must show "counsel's performance was deficient" and "resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.) "On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*Ibid.*)

"Counsel does not render ineffective assistance by failing to make motions or objections that counsel reasonably determines would be futile." (*People v. Price* (1991) 1 Cal.4th 324, 387.) Here, defendant's sentence for first degree murder already exceeded 20 years before the firearm enhancement was imposed, and defense counsel may have chosen not to raise section 1385(c)(2)(D) because he did not believe it applied in this circumstance. This would have been a reasonable understanding of section 1385(c)(2)(D). Indeed, the Third District Court of Appeal recently held that, under "the plain language" of the statute, section 1385(c)(2)(C) "does not apply where the enhancement itself does not 'result' in a sentence exceeding 20 years," and where "the sentence already exceeded 20 years without any enhancement, . . . application of the firearm enhancement did not result in the effect addressed by this provision." (See *People v. Torres* (2025) 113 Cal. App. 5th 88, 93.) We therefore conclude defendant has failed to establish

ineffective assistance in defense counsel's decision not to argue section 1385(c)(2)(D) applied in this case.

## DISPOSITION

The judgment is affirmed.


                                       _____

                                       Miller, J.


WE CONCUR:


_____
Stewart, P. J.


_____
Richman, J.


A169821, *People v. McMahon*